**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-50069 |
| *Plaintiff-Appellee*, | D.C. No. 3:19-cr-04034-TWR-1 |
| v. | |
| JOSE PABLO JIMENEZ-CHAIDEZ, | |
| *Defendant-Appellant*. | OPINION |

Appeal from the United States District Court
for the Southern District of California
Todd W. Robinson, District Judge, Presiding

Argued and Submitted July 19, 2023
Pasadena, California

Filed March 25, 2024

Before: Jacqueline H. Nguyen and Danielle J. Forrest,
Circuit Judges, and Richard D. Bennett,[*] District Judge.

Opinion by Judge Forrest;
Partial Dissent by Judge Bennett

---

[*] The Honorable Richard D. Bennett, United States District Judge for the District of Maryland, sitting by designation.

# SUMMARY[**]

## Criminal Law

The panel affirmed Jose Jimenez-Chaidez's jury conviction for knowingly importing cocaine and methamphetamine, vacated his sentence, and remanded for resentencing.

The panel held that the district court properly admitted evidence of Jimenez's prior drug transports. The panel concluded that this prior-act evidence was admitted for the proper purpose of showing knowledge and intent under Federal Rule of Evidence 404(b)(2), and the evidence was not unduly prejudicial under Rule 403.

The panel held that the district court did not abuse its discretion in allowing an FBI agent to testify about the extraction of data from a cellphone as a lay witness rather than an expert witness because the agent's testimony did not require specialized knowledge.

The panel held that the district court erred by not making an explicit reliability finding related to an expert's testimony about the value of the drugs found in Jimenez's vehicle when he was arrested, but this error was harmless.

The panel vacated Jimenez's sentence and remanded for resentencing in line with recent authority clarifying the process for conducting a mitigating role inquiry under U.S.S.G. § 3B1.2.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

District Judge Bennett concurred with the majority with respect to its holdings that the prior-acts evidence was properly admitted, that any error as to drug value was harmless, and that the case must be remanded for resentencing. Dissenting in part, Judge Bennett would hold that the district court abused its discretion in treating the testimony regarding cellphone data as lay testimony because this testimony was clearly expert testimony within the ambit of Federal Rule of Evidence 702.

## COUNSEL

Jessica Agatstein (argued), Elana R. Fogel, and Sara M. Peloquin, Assistant Federal Public Defenders, Federal Defenders of San Diego, San Diego, California, for Defendant-Appellant.

Daniel E. Zipp (argued), Assistant United States Attorney, Appellate Section Chief, Criminal Division; Derek Ko, Assistant United States Attorney; Deborah E. Bercovitch, Special Assistant United States Attorney; Randy S. Grossman, United States Attorney; United States Department of Justice, United States Attorney's Office, San Diego, California; for Plaintiff-Appellee.

## OPINION

FORREST, Circuit Judge:

Jose Jimenez-Chaidez drove large amounts of methamphetamine and cocaine into the United States from Mexico. He appeals his drug importation conviction and resulting sentence, arguing that the district court (1) admitted improper propensity evidence, (2) erroneously allowed an FBI agent to testify about the extraction of data from a cellphone as a lay witness rather than an expert witness, (3) failed to determine the reliability of a drug-valuation expert, and (4) applied the wrong legal standard in denying him a minor-role sentencing reduction under U.S.S.G. § 3B1.2. We have jurisdiction under 28 U.S.C. § 1291. We affirm Jimenez's conviction, but we vacate his sentence and remand for resentencing.

## I.   BACKGROUND

In September 2019, Jimenez was living in Tecate, Mexico and had been working at a bakery in Southern California. He crossed the United States/Mexico border five to six days a week. On September 10, Jimenez entered the United States through the Tecate Port of Entry. In the post-primary screening area, a border patrol canine indicated that drugs were present in Jimenez's car. Officers found cocaine and methamphetamine hidden in the trunk and the modified gas tank. Jimenez was charged with knowingly importing cocaine and methamphetamine under 21 U.S.C. §§ 952, 960. At trial, Jimenez's counsel argued that Jimenez did not know the drugs were in his car, and he was just a "blind mule."

## A.  Evidence of Prior Smuggling

Before Jimenez's trial, the Government interviewed Alejandro Ramos, a prisoner who had pleaded guilty to importing methamphetamine. Ramos stated he worked as a "scout" in the same organization as Jimenez and, on several prior occasions, including multiple times in May 2019, had met Jimenez in the United States to unload drugs from Jimenez's car. The Government moved in limine to admit Ramos's testimony, border crossing records, and evidence from Ramos's phone to demonstrate Jimenez's knowledge and intent to import drugs on the day he was arrested. After thorough argument, the district court granted the Government's motion, finding that the evidence made "[Jimenez]'s relevant knowledge and intent more probable than it would be without the other act evidence." The district court also concluded that the danger of unfair prejudice from the evidence of Jimenez's other smuggling activity did not substantially outweigh its probative value.

At trial, Ramos testified that he knew Jimenez from a garage in Tecate, Mexico where cars were modified to carry drugs across the border. Jimenez left his car at the garage and picked the car up after its gas tank was modified to carry drugs. Ramos also testified that he worked as a scout approximately ten times when Jimenez drove drugs across the border, including multiple times in May 2019. Ramos would arrive at Jimenez's workplace in the United States where Jimenez's car was parked and contact Jimenez to exchange car keys. Ramos would then drive Jimenez's car to another location, unload the drugs, and then return the car to Jimenez's work. Jimenez was paid for the transport when he returned to Tecate.

In addition to Ramos's testimony, the Government introduced records showing that Ramos and Jimenez crossed into the United States within 90 minutes of one another on May 21, May 22, and May 30, 2019, and that Ramos's cell phone was near Jimenez's workplace on these dates during the time Jimenez was working. It also introduced evidence of the significant value of the drugs found in Jimenez's car to suggest it was unlikely Jimenez did not know they were present.

To corroborate Ramos's testimony, the Government called FBI Special Agent Edasi to testify about location data extracted from Ramos's cellphone. Jimenez objected to Agent Edasi's testimony because the Government failed to disclose him as an expert witness before trial. In response, the Government explained that it was offering Agent Edasi only as a lay witness "in his capacity as a forensic examiner who looked at a phone and found some items." The district court clarified: "So he plugged in the phone and it downloaded, and he's going to say what was on the phone?" The Government responded affirmatively, and Jimenez's counsel dropped her objection.

Agent Edasi testified that he extracted data from Ramos's phone using a software tool called Cellebrite. He explained that Cellebrite is used for performing data extractions, and it also has tools for "analyzing and parsing data," or interpreting digital code "in a language that's easy to understand." Following this discussion, Jimenez's counsel objected to Agent Edasi's testimony about the examination under Federal Rule of Criminal Procedure 16[1]

---

[1] This rule governs the government's disclosure obligations for expert witnesses. Fed. R. Crim. P. 16(a)(1)(G).

and Federal Rule of Evidence 702.[2] The district court overruled the objection.

Agent Edasi explained that he retrieved Ramos's cell phone from evidence, isolated it from network connections, and then connected it to Cellebrite "to extract the data." After connecting the phone to Cellebrite, the data was parsed and analyzed to create a report. Agent Edasi testified that the Cellebrite report could be understood without any knowledge of software. The report contained information about Ramos's phone, including his Apple ID and phone number; information about the contacts saved in the phone; and location data showing where the phone had been. The location-data report contained time-stamped GPS coordinates from a frequently visited locations database. Agent Edasi explained that he entered the GPS coordinates from the report into Google Maps to identify the location and that the coordinates showed that Ramos's phone was near Jimenez's workplace on May 21, 22, and 30, 2019, during Jimenez's shifts.

## B. Drug Value

FBI Special Agent Lewenthal testified about the value of the drugs found in Jimenez's vehicle when Jimenez was arrested. The Government intended for Agent Lewenthal to testify as an expert witness but failed to properly disclose him as an expert before trial. The district court conditionally allowed Agent Lewenthal's testimony but gave defense counsel "wide latitude" to examine Agent Lewenthal before the court determined if he was qualified as an expert. Agent Lewenthal testified to his extensive law enforcement

---

[2] This rule governs the admissibility of expert opinion testimony. Fed. R. Evid. 702.

experience: nearly thirty years working for Border Patrol and Homeland Security, specific drug training, and participation in 600–700 narcotics investigations. He also testified that he calculated the wholesale and retail value of the drugs in Jimenez's car by speaking to one informant and three law enforcement officers working in the area and by consulting a publication that compiled drug prices reported by law enforcement. After Jimenez's counsel questioned Agent Lewenthal about his qualifications, the district court designated him an expert, and Agent Lewenthal offered his opinion regarding the value of the drugs: over $60,000 of methamphetamine and nearly $250,000 of cocaine. Jimenez later renewed his objection to Agent Lewenthal's qualification as an expert and questioned the method by which he calculated drug values. The district court declined to strike Agent Lewenthal's testimony based on the Government's failure to provide an expert disclosure.

## C.  Sentencing

The jury found Jimenez guilty. At sentencing, Jimenez argued that he qualified for a minor-role reduction under U.S.S.G. § 3B1.2. The district court considered the five factors listed in the Guidelines and declined to grant Jimenez the requested reduction. The district court sentenced Jimenez to 86 months' imprisonment with five years of supervised release. Jimenez timely appealed.

## II.  DISCUSSION

### A.  Prior Acts

Jimenez first argues that the evidence of his prior drug transports in May 2019 was improper propensity evidence. Courts may not admit evidence of a defendant's prior acts to suggest that the defendant is more likely guilty of the

charged crime because of his past behavior (i.e., the "propensity inference"). Fed. R. Evid. 404(b)(1). But the same evidence may be admissible for other purposes, including to prove knowledge and intent. Fed. R. Evid. 404(b)(2). To admit evidence of prior acts, courts proceed in two steps. First, the court determines whether the prior-act evidence is admissible for a proper purpose under Rule 404(b)(2). *United States v. Holiday*, 998 F.3d 888, 895 (9th Cir. 2021), *vacated*, 142 S. Ct. 2857 (2022), *aff'd in pertinent part*, 53 F.4th 501 (9th Cir. 2022). Second, if the evidence is admissible for a non-propensity purpose, the court determines whether the evidence nonetheless should be excluded under Rule 403 as unduly prejudicial. *Id.* We review the district court's "[e]videntiary rulings admitting evidence of other acts under Federal Rule of Evidence 404(b) . . . for an abuse of discretion," although we review whether such evidence is relevant to the crime charged de novo. *United States v. Rodriguez*, 880 F.3d 1151, 1167 (9th Cir. 2018) (citation omitted). "We review the district court's admission of evidence under Rule 403 for an abuse of discretion." *United States v. Cox*, 963 F.3d 915, 925 (9th Cir. 2020).

### 1.  Rule 404(b)

Prior-acts evidence must satisfy four requirements to be admissible under Rule 404(b)(2): (1) it must tend to prove a material issue; (2) the prior acts must not be too remote in time; (3) there must be sufficient evidence for a reasonable jury to conclude that the defendant committed the prior acts; and (4) when used to show knowledge and intent, the prior acts must be sufficiently similar to the charged offense. *Rodriguez*, 880 F.3d at 1167; *United States v. Plancarte-Alvarez*, 366 F.3d 1058, 1062 (9th Cir. 2004).

Initially, we note that the second and third requirements are satisfied. The smuggling incidents that the Government introduced occurred within five months of Jimenez's arrest. *Cf. United States v. Lozano*, 623 F.3d 1055, 1059–60 (9th Cir. 2010) (evidence that the defendant had possessed drugs eight months before the charged offense was not too remote). The Government also introduced sufficient evidence for the jury to reasonably conclude that Jimenez had smuggled drugs in May 2019, including testimony from Ramos, corroborating cellphone data, and border crossing records.

To satisfy the first and fourth requirements (relevance and similarity), we have emphasized that the government must show a "logical connection" between the defendant's knowledge obtained from commission of the prior acts and the knowledge at issue in the current case. *Rodriguez*, 880 F.3d at 1167; *United States v. Ramos-Atondo*, 732 F.3d 1113, 1123 (9th Cir. 2013). The logical connection "must be 'supported by some propensity-free chain of reasoning.'" *Rodriguez*, 880 F.3d at 1168 (quoting *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (en banc)). Jimenez argues that the evidence of his prior smuggling and his knowledge in the current case can only be logically connected through improper propensity reasoning. We disagree.

With regard to relevance, "[w]e have consistently held that evidence of a defendant's prior possession or sale of narcotics is relevant under Rule 404(b) to issues of intent [and] knowledge" in drug importation cases. *United States v. Vo*, 413 F.3d 1010, 1018 (9th Cir. 2005) (quoting *United States v. Mehrmanesh*, 689 F.2d 822, 832 (9th Cir. 1982)); *see also United States v. Rubio-Estrada*, 857 F.2d 845, 848–49 (1st Cir. 1988) (collecting cases). Moreover, whether Jimenez knew there were drugs in his car is an element of

his charged offense. 21 U.S.C. §§ 952, 960. Thus, we easily conclude that the evidence that the Government presented regarding Jimenez's prior smuggling made his knowledge that he was smuggling on the day of his arrest more probable and is, therefore, relevant. Fed. R. Evid. 401.

Jimenez's prior acts were also sufficiently similar to his charged conduct to satisfy the fourth requirement. The Government presented evidence that Jimenez left his car at a garage where it was modified to carry drugs, and that he had previously crossed the border at the same time of day, at the same location, driving the same car, wearing the same work uniform, and storing drugs in the same location in his vehicle. *Cf. Plancarte-Alvarez*, 366 F.3d at 1062 (admission of a prior smuggling incident "close in time and remarkably similar" supported "the government's position that [the defendant] was engaged in purposeful and repetitive criminal behavior and was not . . . an innocent victim").

The logical connection between the prior acts of smuggling and the charged smuggling does not require propensity reasoning to establish knowledge and intent. Jimenez does not argue that there were no drugs in his vehicle when he was arrested; he argues that he did not know the drugs were there. And it is not merely that Jimenez previously engaged in drug smuggling that evidences he knew drugs were in his vehicle, which would be impermissible propensity evidence. It is how the prior and subject smuggling occurred. The Government's evidence established that Jimenez took his vehicle to a garage in Mexico, where it was modified to hide drugs. The evidence further established that, on multiple prior occasions, Jimenez left his vehicle at the garage where it was loaded with drugs, drove across the border, and let another person drive his vehicle away while he was at work and then return it. There

is no apparent innocent explanation for why Jimenez repeatedly engaged in this pattern and allowed Ramos to drive his car during his workday, nor has Jimenez offered one. We have previously recognized that similar pattern evidence can permissibly show that a defendant knew there were drugs in his vehicle. *See United States v. Beckman*, 298 F.3d 788, 794 (9th Cir. 2002) (holding Rule 404(b) permitted testimony that a defendant previously smuggled marijuana across the border in the same fashion as the charged conduct). Simply stated, the jury could conclude from the evidence of the May 2019 events that Jimenez *knew* there were drugs in his vehicle because the circumstances of his prior acts indicated knowledge, as opposed to simply concluding that Jimenez knew he was smuggling drugs because he had done so in the past.

## 2. Rule 403

Even if prior-acts evidence is admissible under Rule 404(b), district courts should exclude it if the danger of unfair prejudice "substantially outweigh[s]" the evidence's probative value. *Cox*, 963 F.3d at 925 (quoting *United States v. Banks*, 514 F.3d 959, 976 (9th Cir. 2008)). Jimenez argues that the district court abused its discretion because the prior acts evidence dominated the trial and invited the jury to engage in propensity reasoning. Jimenez compares his case to a First Circuit decision, *United States v. García-Sierra*, 994 F.3d 17 (1st Cir. 2017). There, the government introduced evidence that the defendant had smuggled drugs via boat from South America into Puerto Rico to show that he knew he was smuggling drugs by the same means two years later, for which he was charged. *Id.* at 24–25. As we do here, the First Circuit found the prior-acts evidence admissible under Rule 404(b) to show knowledge. *Id.* at 31 ("If credited, this evidence would tend to decrease the

likelihood that [defendant] was ignorant of the illicit purpose of the sea voyage on which he had embarked . . . .”). But it concluded that the district court nonetheless abused its discretion under Rule 403 by admitting the evidence. *Id.* at 32. The court noted several facts: that the government's other evidence of knowledge was so strong that the probative value of the prior acts was diminished; the defendant was not clearly tied to the earlier smuggling incident; and the “omnibus” jury instruction listing all the permissible uses for prior-acts evidence under Rule 404(b)(2) failed to adequately narrow the jury's focus on the purposes actually at issue. *Id.* at 33–35.

*García-Sierra* is distinguishable from the present case. Here, the Government's evidence of Jimenez's prior smuggling had substantial probative value. The Government did not have other evidence clearly demonstrating Jimenez's knowledge that drugs were in this vehicle during the incident for which he was tried. Ramos was not involved in that transfer, and there was no other direct evidence of Jimenez's knowledge. Indeed, Jimenez argued before the district court that the evidence was prejudicial because it was so central to the Government's proof of his knowledge. Unlike in *García-Sierra*, Ramos's testimony directly tied Jimenez to the May 2019 incidents. And the district court here sufficiently narrowed the jury's focus by instructing it to consider the prior-acts evidence for “intent, plan, preparation, and knowledge, and for no other purpose.” In contrast to the over-encompassing instruction in *García-Sierra*, 994 F.3d at 34, we have found more limited instructions like the one given in this case sufficient to remedy the potential prejudice from evidence of prior drug activity, *Vo*, 413 F.3d at 1017, 1019 (approving a jury instruction to consider evidence of a

prior drug conviction for "intent, knowledge, absence of mistake, and for no other purpose").**[3]**

For these reasons, we conclude that the district court did not abuse its discretion under Rule 403 by concluding that the evidence of Jimenez's prior smuggling activity was more probative than prejudicial and by admitting this evidence.

## B. Cellphone Extraction

Next, Jimenez argues that the district court abused its discretion by allowing Agent Edasi to testify as a lay witness about extracting and "parsing" location data from Ramos's cellphone; and about his interpretation of the GPS coordinates and time stamps recovered from the cellphone. Lay witnesses may testify to opinions that are rationally based on their perceptions, but they may not testify to opinions based on "scientific, technical, or other specialized knowledge." Fed. R. Evid. 701. A witness must testify as an expert if offering opinions that require "demonstrable expertise," *United States v. Figueroa-Lopez*, 125 F.3d 1241, 1246 (9th Cir. 1997), or go "beyond the common knowledge of the average layman," *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002). A district court's decision to admit lay testimony under Rule 701 "will be overturned only if it constitutes a clear abuse of discretion." *United States v.*

---

[3] To the extent Jimenez argues the district court failed to adequately explain the grounds for its decision, the record as a whole establishes that the district court weighed the proper considerations. *United States v. Sangrey*, 586 F.2d 1312, 1315 (9th Cir. 1978) ("As long as it appears from the record as a whole that the trial judge adequately weighed the probative value and prejudicial effect of proffered evidence before its admission, we conclude that the demands of Rule 403 have been met."). The district court heard and actively participated in extensive argument regarding the content of the evidence, its relevance to the charged crime, and Jimenez's concerns of unfair prejudice.

*Barragan*, 871 F.3d 689, 704 (9th Cir. 2017) (quoting *United States v. Gadson*, 763 F.3d 1189, 1209 (9th Cir. 2014)).

It follows from these principles that a lay witness may testify to the information extracted from a phone so long as the testimony does not require "specialized knowledge." Fed. R. Evid. 701(c); *accord United States v. Williams*, 83 F.4th 994, 995 (5th Cir. 2023) ("When law enforcement uses Cellebrite to pull information from a phone and a lay juror would require no additional interpretation to understand that information, the party does not need to introduce the evidence through an expert."). Here, Agent Edasi testified that he connected Ramos's cellphone to a Cellebrite device, used the Cellebrite software to extract and "parse" the data into reports, reviewed the time-stamped GPS coordinates listed on the location-data reports, and entered those coordinates into Google Maps to identify where the cellphone had been. GPS information is readily available and understandable to the general public, *see, e.g.*, *United States v. Brooks*, 715 F.3d 1069, 1078 (8th Cir. 2013) ("Commercial GPS units are widely available, and most modern cell phones have GPS tracking capabilities."), and the Cellebrite report that contained this information was in a format that was easily understandable to anyone familiar with GPS coordinates. Agent Edasi's testimony about this information and how it was obtained largely was not opinion testimony, and to the extent it was, it was based on his perception and not specialized knowledge. Fed. R. Evid. 701; *cf. United States v. Montijo-Maysonet*, 974 F.3d 34, 47 (1st Cir. 2020) (a government witness was not required to testify as an expert when "all she did was to read from the [extraction] report").

Jimenez suggests that Agent Edasi did more than simply extract data when he testified that he parsed and analyzed the

data to create a report. This argument misunderstands the record. Agent Edasi testified that "parsing" means presenting digital code in a legible format and that Cellebrite is used for "analyzing and parsing data" and can create reports that are easily understood without technical knowledge. Our task here is limited to determining whether the district court committed a "clear abuse of discretion" in allowing Agent Edasi's testimony. *Barragan*, 871 F.3d at 704. In context, the district court could plausibly have inferred that Agent Edasi used Cellebrite and that Cellebrite analyzed and parsed the data to create the report, not that Agent Edasi personally parsed and analyzed the data. This inference is all the more plausible because neither the Government nor Jimenez elicited testimony from Agent Edasi about how the data was parsed, the technical process for how Cellebrite parses and analyzes data, or the reliability of the Cellebrite software. *Cf. Williams*, 83 F.4th at 997 ("At no point did he speak to the reliability of the software, except that he double-checked some of the report by looking directly at the source material in the phones themselves."); *Montijo-Maysonet*, 974 F.3d at 48 n.12 ("Perez 'offered no assurances about how well [the extraction software] performed.'" (quoting *United States v. Chavez-Lopez*, 767 F. App'x 431, 434 (4th Cir. 2019))). *Contra United States v. Wehrle*, 985 F.3d 549, 554 (7th Cir. 2021) (requiring a witness to testify as an expert when her testimony concerned "technical concepts," including "reliability and safeguards").

The dissent suggests that the Government knew Agent Edasi had to be presented as an expert and only sought to recharacterize him as a lay witness because the prosecutor failed to properly disclose him as an expert. It may be that the Government originally intended to present Agent Edasi

as an expert, but that is not determinative of whether he *had* to be presented that way. The content of the testimony dictates the answer to that question. *See* Fed. R. Evid. 701–02 (classifying testimony as lay or expert based on the characteristics of the testimony, not the witness); *see also United States v. Caballero*, 277 F.3d 1235, 1247 (10th Cir. 2002) ("[W]itnesses need not testify as experts simply because they are experts—the nature and object of their testimony determines whether the procedural protections of Rule 702 apply."). And here, Agent Edasi did not opine on Cellebrite's technical methodology or reliability, *nor did Jimenez-Chaidez raise a challenge related to those issues*. Rather, Agent Edasi described that he plugged the cellphone into Cellebrite and that Cellebrite extracted data from the phone and generated reports that were understandable to a lay person. Thus, the district court's conclusion that Agent Edasi properly testified as a lay witness was not "illogical, implausible, or without support in inferences that may be drawn from facts in the record." *United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (en banc).[4]

---

[4] The dissent also suggests that cellphone location data must be introduced by expert testimony. At trial, Jimenez did not object to the location data itself (as opposed to the extraction of that data), so we review its admission for plain error. *Tan Lam v. City of Los Banos*, 976 F.3d 986, 1006 (9th Cir. 2020) (citing Fed. R. Evid. 103(e)). It is common knowledge that smartphones track users' location using GPS. *See, e.g.*, *United States v. Jones*, 565 U.S. 400, 428 (2012) (Alito, J., concurring) ("[N]ew 'smart phones,' which are equipped with a GPS device, permit more precise tracking [than cell towers]."); *United States v. Duggar*, 76 F.4th 788, 795 (8th Cir. 2023) (a witness was not required to explain how iPhone photos are tagged with GPS locations because GPS's "accuracy and reliability are not subject to reasonable dispute" (internal quotations omitted)); *see also Location Services & Privacy*, Apple, http://www.apple.com/legal/privacy/data/en/location-services/

Our decision today does not foreclose that there may be cases involving Cellebrite or other similar technology that do require expert testimony, particularly where the functionality or reliability of the technology is challenged or otherwise at issue. That simply is not this case. The Government limited the scope of Agent Edasi's testimony to his use of the Cellebrite software and his perceptions of the data that the software produced that are readily understandable without having him opine about the software's technical processes or reliability or other issues that require specialized knowledge.

## C. Drug Value

Finally, Jimenez argues that the district court erred by not making an explicit reliability finding related to Agent Lewenthal's expert testimony about the value of the drugs found in Jimenez's vehicle when he was arrested. We agree that failing to make this finding was error, but this error was harmless.

A court may admit expert testimony when the testimony is helpful, based on "sufficient facts or data," and produced by "reliable principles and methods," reliably applied to the facts of the case. Fed. R. Evid. 702. That is, expert testimony is properly admitted when it "rests on a reliable foundation and is relevant to the task at hand." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010) (quoting *Daubert v. Merrell*

---

(last visited Mar. 14, 2024) [http://perma.cc/85ZM-JTGQ] (iPhone's Location Services uses GPS and Bluetooth where available). And it is also well known that cellphones store some location data. A Google search for "iPhone location stored," for example, leads to several different websites instructing users how to access historic location data on their phones. The district court did not plainly err in admitting the location data from Ramos's phone.

*Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). District courts have wide discretion in determining whether expert testimony is reliable, but they cannot avoid making that determination. *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020). "A district court cannot be silent about reliability when challenged." *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022).

Though Jimenez never used the magic word "reliability" in objecting to Agent Lewenthal's testimony, he did object under Rule 702, explaining: "based on what the agent said today . . . the way he came about the numbers in this particular case . . . one informant, three people that he talked to and one publication certainly doesn't seem like a large sample size or body of work . . . ." *Cf. United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1189 (9th Cir. 2019) (per curiam) (applying the abuse of discretion standard where the defendant "object[ed] to the qualifying [of the witness] as an expert"). This was sufficient to trigger the district court's obligation to analyze the reliability of this evidence and state its finding on the record. *Holguin*, 51 F.4th at 854–55.

Nonetheless, we will not reverse the district court if the government shows that, more likely than not, "the error did not materially affect the verdict." *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1099 (9th Cir. 2005) (quoting *United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997) (en banc)). The government can show harmlessness in two ways. First, an error is harmless when "the admitted expert testimony was relevant and reliable under *Daubert* based on the record established by the district court." *Ruvalcaba-Garcia*, 923 F.3d at 1190 (cleaned up). Second, an error is harmless if the jury more likely than not would have reached the same verdict even without the expert testimony. *Id.*

Here, Jimenez concedes that Agent Lewenthal was qualified to testify as an expert. He challenges only the reliability of Agent Lewenthal's methods for calculating American and Mexican drug prices. As to the wholesale and retail prices for drugs in the United States, Agent Lewenthal testified that he spoke with an informant, consulted three other law enforcement officers working in the area, and referenced a publication that other law enforcement officers rely on for drug pricing. In light of his extensive experience, and his reliance on sources trusted by others in the field, the record shows that his testimony regarding drug prices in the United States was reliable. *Cf. United States v. Alatorre*, 222 F.3d 1098, 1104 (9th Cir. 2000) (an agent was qualified to testify to drug value based on experience, training, and knowledge gained through investigations). And even if Agent Lewenthal's testimony regarding Mexican drug prices was unreliable because the publication he relied on does not cover Mexico, this evidence likely did not materially impact the jury's verdict. The high American price of the drugs and their substantial quantity support the inference that such valuable cargo would not be entrusted to an ignorant courier. *See, e.g.*, *United States v. Recio*, 371 F.3d 1093, 1105 (9th Cir. 2004) ("The substantial value of the cocaine and marijuana involved in this case supports an inference that drug smugglers would not have entrusted the pick-up's cargo to an unknowing outsider."). Thus, we conclude that the district court's error in not making an explicit reliability finding related to Agent Lewenthal's testimony was harmless error.

## D.  Sentencing

Finally, Jimenez argues that the district court erred in not granting him a minor-role sentencing reduction. After the district court sentenced Jimenez, we clarified the process for

conducting the "mitigating role" inquiry under U.S.S.G. § 3B1.2. "The relevant comparison is to the other participants in the defendant's crime, not to typical defendants who commit similar crimes." *United States v. Dominguez-Caicedo*, 40 F.4th 938, 960 (9th Cir. 2022); *United States v. Klensch*, 87 F.4th 1159, 1163 (9th Cir. 2023). We outlined a three-step analysis for weighing relative culpability. *Klensch*, 87 F.4th at 1163–64 (discussing *Dominguez-Caicedo*, 40 F.4th at 960). Because the district court did not have the benefit of recent decisions on this issue, we vacate Jimenez's sentence and remand for resentencing in line with our recent authority.

**AFFIRMED in part, VACATED, and REMANDED.**

BENNETT, District Judge, dissenting in part:

I concur with the majority with respect to the admissibility of prior acts evidence under Rule 404(b) and that the district court did not abuse its discretion under Rule 403. I further concur that any error as to drug value was harmless. Furthermore, I concur that this case be remanded to the district court for resentencing in light of developments in this Court's jurisprudence with respect to the process for conducting the "mitigating role" inquiry under U.S.S.G. § 3B1.2. However, the district court erred in allowing Homeland Security Investigations Special Agent David Edasi to proffer testimony regarding the data from Ramos's cellphone. The record before this Court makes clear that Edasi's testimony exceeded the scope of Fed. R. Evid. 701 and was clearly expert testimony within the ambit of Rule 702. The decision to treat Edasi's testimony as lay testimony deprived Jimenez of important protections provided to

criminal defendants under Fed. R. Crim. P. 16. Because I would find that the district court abused its discretion in admitting Edasi's testimony and the error was not harmless, I respectfully dissent. Jimenez's conviction should be vacated and the case remanded for a new trial.

Before Jimenez's trial began, the Government filed a Motion in Limine to admit, among other things, the expert testimony of Special Agent Eric Sajo, a "Computer Forensics Analyst." The Government indicated that Sajo would "testify as to the process used to extract information" from a cellphone seized from Jimenez, "the reliability of the obtained data," and "may offer an expert opinion that the data was recorded, taken, or made on the date and time reflected in the cellphone extraction report or related [cellphone] summary charts." The Government stated that Sajo "[would] base his opinion on his background, education, training, and experience, along with his knowledge and use of accepted cellphone data extraction and analysis." Special Agent Sajo was the only such expert mentioned in that motion, but he did not testify at trial.

However, during the third day of trial, the Government called Special Agent Edasi to testify concerning location history data that he had extracted from a cellphone connected to Alejandro Ramos—a key witness in the Government's case—to support the veracity of Ramos's testimony as to Jimenez's prior, uncharged acts of smuggling. Defense counsel objected under Fed. R. Crim. P. 16 and Fed. R. Evid. 702. The prosecutor stated that the Government could "solve this problem," explaining that it did "not intend[] to tender Mr. Edasi as an expert," but rather that he was just going to "testify in his capacity as a forensic examiner who looked at a phone and found some items."

However, it is clear from the record that the Government did elicit expert testimony from Edasi.

The testimony began with Special Agent Edasi explaining his role as a computer forensics agent, the functions of that role, and his background and training in digital evidence analysis. Edasi testified that he had experience using Cellebrite, a mobile device data extraction and recovery software, and further explained that he had gained additional experience "in the area of digital forensics since [his] train[ing]," stating that he had completed "[a]pproximately 350" mobile device examinations. Edasi defined certain digital forensic analysis terms that he would use during his testimony. He explained that "extraction" is "taking digital evidence and retrieving it off of a device . . . kind of like making a copy." He explained that "parsing" is "another way to say that you are interpreting the evidence and putting it in a language that [is] easy to understand from a digital code to a legible end-user language."

Special Agent Edasi recounted that on October 1, 2019, he examined an Apple iPhone 7-plus with an International Mobile Equipment Identifier of 359216072458515. When the prosecutor asked Edasi to "describe the process of how [he] conducted [his] examination," defense counsel objected under Fed. R. Crim. P. 16 and Fed. R. Evid. 702. After the district court overruled the objection, Edasi explained:

> Typically what I do is I retrieve the device from our evidence storage facility. I open up the sealed evidence bag and take photos of the device. . . . I isolate the device from any network connections, which we put in something called a stronghold box . . . [that]

doesn't allow any cellular, WiFi or Bluetooth signals to enter. I verify that the device is in airplane mode, and then at that point, I would connect the device to a software tool to extract the data. Once that is done, then I would parse the data, analyze it and create a report.

Edasi confirmed he used Cellebrite for this specific examination.

During his testimony, the prosecutor asked whether "device locations" "were . . . parsed as part of [the] examination," and Edasi indicated "[t]hey were." Edasi explained that "[d]evice locations are historical entries for location data on the phone, so places that the phone had been." He testified that these entries produced "GPS coordinates and locations that were on the device." Edasi stated that he checked the location represented by these coordinates by putting them into Google Maps to "generate a map." According to Edasi, these entries showed that the cellphone had been near Jimenez's workplace on several dates in May 2019. The prosecutor asked Edasi where he found the locations, and Edasi explained "in a database that is used for frequently visited locations." The Government further inquired whether Edasi "also parse[d] the device's log entries as part of [his] examination," and Edasi replied: "I did." After the Government moved to introduce the log entries into evidence, defense counsel renewed the Fed. R. Crim. P. 16 and Fed. R. Evid. 702 objection "as to the content of [the log entries] and the ability to explain them without that basis," which the district court overruled.

In its closing argument, the Government relied on Edasi's testimony to demonstrate that the cellphone was at

the locations which he identified at the times at which he testified. The Government explained that this data was "just an entry in the phone that none of us would ever see, unless somebody did a deep dive like this on our phones." The Government recounted Edasi's testimony that the "phone shows up at Ne-Mo's from 10:36 to 10:44" on May 21, 2019, "from 10:12 to 10: 21" on May 22, 2019, and from "10:13 to 10:20" on May 30, 2019. The prosecutor emphasized that this data shows that "a guy [drove] all the way from Tecate to [a] place in Escondido for seven minutes." "That's how you know," the prosecutor emphasized, that Ramos was honest about "what [he] and [Jimenez] were doing together." The majority accepts the Government's recharacterization at oral argument as to Special Agent's Edasi's process in analyzing the phone.[1] This is contrary to the description provided by Edasi himself, as explained in the record before this Court and as presented to the jury.

This Court has recognized that the distinction between lay and expert testimony and the proper application of the Federal Rules of Evidence are vital to ensuring a fair trial because expert testimony has a "powerful nature" with "potential to mislead the jury." *United States v. Rincon*, 28 F.3d 921, 926 (9th Cir. 1994). Depending on the circumstances, law enforcement testimony may be both

---

[1] During oral argument before this Court, the Government conceded that Special Agent Edasi "was an expert, [and] he was intended to be called as an expert . . . [until the Government] realized [it] had not turned over the CV and . . . decided to present him as a lay witness at trial." The Government then asserted that Edasi mischaracterized what he did, and that his testimony implied "more expertise than what he was actually doing."

expert and lay testimony, *United States v. Reed*, 575 F.3d 900, 922 (9th Cir. 2009), but this Court has cautioned:

> While witnesses who testify as an expert may receive "unmerited credibility" for their lay testimony, because expert testimony is "likely to carry special weight with the jury," the converse is not true: a lay witness's testimony carries no special weight, even if at points the lay witness has recourse to relevant background and training.

*United States v. Gadson*, 763 F.3d 1189, 1212 (9th Cir. 2014) (quoting *United States v. Freeman*, 498 F.3d 893, 903 (9th Cir. 2007)).

The Advisory Committee Notes on the 2000 Amendment to Rule 701 stress this exact concern:

> Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing. . . . [T]he amendment also ensures that a party will not evade the expert witness disclosure requirements set forth in . . . Fed. R. Crim. P. 16 by simply calling an expert witness in the guise of a layperson.

Fed. R. Evid. 701 advisory committee's notes to 2000 amendments.[2] This Court recognized this important

---

[2] In affirming the district court's decision to admit Special Agent Edasi's testimony as lay under Rule 701, the majority also obfuscates the gravity of the Government's failure to adhere to the requirements of Fed. R.

principle in *United States v. Figueroa-Lopez*, 125 F.3d 1241 (9th Cir. 1997): "The mere percipience of a witness to the facts on which he wishes to tender an opinion does not trump Rule 702. Otherwise, a layperson witnessing the removal of a bullet from a heart during an autopsy could opine as to the cause of the decedent's death." *Id.* at 1246.

Here, Special Agent Edasi's testimony crossed the threshold into "expert" territory when he discussed the technical aspects of data parsing and analysis and when he explained his findings therefrom. This is because the process of and conclusions drawn from digital evidence analysis required "demonstrable expertise." *Id*. Indeed, Edasi testified that he underwent substantial training in order to perform data analysis. Moreover, Edasi testified that cellphone analysis required him to "interpret[] the evidence" and translate it "from a digital code to a legible end-user language." This information is not within "the common knowledge of the average layman." *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002). The Government acknowledged during its closing argument that the data was of a sort that no layperson "would ever see, unless somebody did a deep dive like this on our phones."

The majority has cited the opinion of the United States Court of Appeals for the First Circuit in *United States v. Montijo-Maysonet*, 974 F.3d 34 (1st Cir. 2020), emphasizing the court's finding that the use of forensic software to copy information from a cellphone and display it on paper did not

---

Crim. P. 16, which include disclosure timelines "to provide a fair opportunity for each party to meet the other side's expert evidence." Fed. R. Crim. P. 16 advisory committee's notes to 2022 amendments. Simply stated, the Government deprived Jimenez of these important protections when it failed to provide Edasi's qualifications to the defense.

render the testimony expert when all the witness did "was [] read from the [extraction] report." Id. at 47–48. However, a closer reading of that opinion makes clear that the facts of that case are distinguishable from the facts of this case. In considering a second piece of the same officer's testimony, the First Circuit noted it faced a "closer call" because the testimony "arguably 'require[d] a technical understanding' of the government's forensic tools and their capabilities." Id. at 49. While the court did not reach a conclusive determination on this question, instead finding any error harmless, id., the reasons supporting this finding are instructive. The court explained that the officer's further testimony "made it pellucid that she had no 'training in forensic tools,'" and "[t]hose clarifications dampened the risk that the jury gave determinative weight to her description of the government's forensic capabilities." *Id.* That is clearly not the situation in this case.

Here, Special Agent Edasi testified that "historical entries for location data on the phone" are "places that the phone had been." While this may appear to be a mere lay perception, Edasi's statement proposes something more conclusory: that the data stored in the phone and extracted by Cellebrite demonstrates that the phone was where the data places it. As suggested in Montijo-Maysonet, this conclusion required a technical understanding of both cellphone location logging and storage, as well as the Government's forensic tools' capabilities to extract that data.

In contrast to the officer's testimony in *Montijo-Maysonet*, Edasi specifically testified to his extensive training in using forensic tools like Cellebrite. As the Seventh Circuit has explained, "an officer testifies as an expert when he brings 'the wealth of his experience as [an] officer to bear on those observations and ma[kes]

connections for the jury based on that specialized knowledge.'" *United States v. Gaytan*, 649 F.3d 573, 582 (7th Cir. 2011) (quoting *United States v. Oriedo*, 498 F.3d 593, 603 (7th Cir. 2007)). Viewing the presentation of Special Agent Edasi's testimony in its entirety, it appears clear that he did exactly this. Thus, Edasi's testimony should have been subject to scrutiny under Rule 702 because it was based on "technical or specialized knowledge acquired through [his] education and experience" as a forensic examiner, and "therefore failed to satisfy Rule 701(c)." *United States v. Millan*, 730 F. App'x 488, 489 (9th Cir. 2018).

The errors presented by the expert presentation of Special Agent Edasi's testimony are further compounded by a second assertion made by the Government: the inner workings of the location data. The use and presentation of data derived from cell towers requires expert testimony. *See, e.g.*, *Carpenter v. United States*, 138 S. Ct. 2206, 2212 (2018) (explaining that testimony about cell-site data was offered as expert testimony); *United States v. Baker*, 58 F.4th 1109, 1125 (9th Cir. 2023) (noting that the prosecution had proffered the testimony of an expert who explained how information about the cell towers to which the defendant's phone connected to on the night of the crime allowed him to discern the phone's movement toward the scene of the crime and away from it afterward). Even setting aside this oversight, the Government has at no point explained how, and to what extent, data that may be purely "GPS" data is distinct from cell tower location data. These reliability concerns are not unfounded. *See, e.g.*, Aaron Blank, *The Limitations and Admissibility of Using Historical Cell Site Data to Track the Location of A Cellular Phone*, 18 RICH. J.L. & TECH. 3, 7 (2011) (describing various factors

impacting the accuracy of cellphone geographic location data).

Lastly, the Government fails to acknowledge that the data evidence is not relevant in the absence of establishing foundation underlying the data. As the Supreme Court explained in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), evidence or testimony must be relevant to the extent that it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* at 591 (quoting Fed. R. Evid. 702). "[I]f the prosecution cannot muster any independent admissible evidence to prove the foundational facts that are essential to the relevance of the expert's testimony, then the expert's testimony cannot be given any weight by the trier of fact." *Williams v. Illinois*, 567 U.S. 50, 81 (2012). In this case, the foundational facts required to establish relevancy include the identity of the person in possession of the phone at the relevant times and, central to this appeal, whether the stored location history accurately demonstrates the location of the phone.[3] If the location data

---

[3] It is notable that during Agent Edasi's testimony, the district court explained to counsel that "this witness examined a cellular telephone that has not been connected to this case whatsoever," and consequently, that "there is no relevance as to any of this information so far." Defense counsel explained that her "suspicion is that the government is introducing these location points to corroborate the evidence of what they are suggesting" and that although "they had an opportunity" to "make this point with their witness," they did not, and therefore "should not now be allowed to introduce a phone that we don't know exactly its province." Defense counsel also explained that "it's for the government to show Alejandro Ramos is present at Ne-Mo's Bakery" and that they "don't know . . . that he had this phone as this time." The district court agreed that "the link has not been established." Nonetheless, after the Government elicited testimony from Edasi that the iPhone was registered to two Apple IDs—one with a name similar to Ramos and the other

is inaccurate or unreliable, it has no probative value. Thus, in order to be probative as to Jimenez's case, the cellphone's location history data must be shown to demonstrate where the phone has actually, or even probably, been. In other words, testimony as to the GPS coordinates identified through cellular data extraction, whether one terms it expert or lay, is entirely irrelevant without expert testimony as to the underlying meaning and reliability of those extracted coordinates. No such showing was made during Jimenez's trial.

Accordingly, if Edasi's testimony is lay under Rule 701, Special Agent Edasi's testimony should have been excluded as irrelevant, as unsubstantiated and uncontextualized data points are not "helpful to . . . determining a fact in issue." Fed. R. Evid. 701(b). Alternatively, the inescapable conclusion is that Edasi's representation that the "historical entries for location data on the phone" extracted by Cellebrite are, indeed, "places that the phone has been," constituted an expert opinion as to the reliability and meaning of the data. The district court's admission of this testimony under Rule 701, despite the Government's clear attempt to sidestep Rule 16 and expert nature of the testimony, warrants a reversal and remand of this case for a new trial.

Because I would find that there was clear error in the admission of expert testimony proffered by Special Agent Edasi with respect to the extraction of data from Ramos's cellphone, I respectfully dissent.

---

representing the name of Ramos's girlfriend—the district court concluded that the testimony cleared the "very low hurdle to make it relevant under [Fed. R. Evid.] 401."