FILED

12/31/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 21-0260

DA 21-0260

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2024 MT 318

STATE OF MONTANA,

      Plaintiff and Appellee,

   v.

DANIELLE WOOD,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Twentieth Judicial District,
In and For the County of Sanders, Cause No. DC 2019-7
Honorable Deborah Kim Christopher, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

    Tammy Hinderman, Appellate Defender, Kathryn Grear Hutchison (argued), Assistant Appellate Defender, Helena, Montana

    For Appellee:

    Austin Knudsen, Montana Attorney General, Bjorn Boyer (argued), Tammy K Plubell, Assistant Attorneys General, Helena, Montana

    Jania Hatfield, Sanders County Attorney, Thompson Falls, Montana, Daniel M. Guzynski, Stephanie Robles, Special Deputy County Attorneys, Helena, Montana

Argued: April 22, 2024
Submitted: April 23, 2024
Decided: December 31, 2024

Filed:

_____
               Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1     Danielle Wood appeals her April 2021 judgment of conviction in the Montana Twentieth Judicial District Court, Sanders County, on the offense of deliberate homicide. Wood raises numerous issues on appeal.[1]  We address only the following dispositive issues:

1.  *Whether the District Court erroneously submitted the State's alternative theory of criminal liability (Accountability for Deliberate Homicide) to the jury without sufficient supporting evidence?*

2.  *Whether the District Court erroneously provided a verdict form that did not allow the jury to unambiguously declare the guilt or innocence of the accused regarding each of the charged offenses or theories of criminal liability?*

We reverse and remand for new trial.

## PROCEDURAL AND FACTUAL BACKGROUND

¶2     In March 2019, the State charged Wood by Information with commission of the offense of deliberate homicide, a felony in violation of § 45-5-102(1)(a), MCA (2017). The Information alleged that she purposely or knowingly caused the death of Matthew LaFriniere "by shooting him with a firearm."[2]

---

[1] Wood further asserts that the District Court also erroneously:  (1) allowed the State to present experts' phone location testimony based on a scientifically unreliable methodology; (2) allowed the State to present a modified demonstrative exhibit without prior pretrial disclosure, and (3) denied her motion for mistrial based on alleged improper prosecutorial closing argument shifting the State's burden of proof to the defendant.  She also asserts that she received non-record-based ineffective assistance of counsel based on defense counsel's failure to request a "mere presence"-at-the-crime-scene jury instruction.

[2] The Information further alleged that Wood was subject to an additional mandatory minimum sentence pursuant to § 46-18-221(1), MCA, based on use of "a firearm in the commission of the . . . offense."  The subsequent Amended Information made an identical allegation.  The State ultimately withdrew an offered instruction on the weapons enhancement in order to "give[] the jury and parties one less thing to worry about."

2

¶3     Several years prior to 2018, Wood and LaFriniere were involved in a romantic relationship that ultimately produced a minor child (S.L.).  Following an acrimonious separation, and protracted custody battle, LaFriniere was awarded primary custody of S.L., in large part due to Wood's alleged alcoholism.  The acrimony continued thereafter.

¶4     On May 2, 2018, Wood picked up S.L. after school from LaFriniere at his place of employment (Thompson Falls Ace Hardware store) pursuant to her scheduled visitation. She later stated the plan was for her to return the child to LaFriniere around 7:30 p.m. that evening.  As 7:30 p.m. approached, Wood was engaged in a social "Pampered Chef" gathering in her Thompson Falls home.  Around 7:00 p.m.,[3] she received a text message on her personal cell phone from an unknown phone number, with LaFriniere listed as the purported author of the text.  The message stated that LaFriniere was "held up in Trout Creek," and instructed Wood to "just hang on to" S.L. and that he would "call when . . . head[ed] back to town."  Shortly thereafter, Wood told S.L. that she had been unable to reach LaFriniere and was thus going to go check and see if he was home.  She then left the gathering and drove to LaFriniere's home several miles west of Thompson Falls, leaving S.L. behind at home with her adult brother and the Pampered Chef party guests.

¶5     At approximately 7:26 p.m., the Sanders County Sheriff's Office received a 911 call from an anonymous female who reported hearing "a boom," seeing "erratic driving," and

---

[3] The Information initially alleged that Wood received the text around 6 p.m.  Subsequent undisputed witness testimony at trial clarified, however, that Wood's cell phone records indicated that she received the text around 7 p.m.

3

witnessing "an apparent altercation" "west of Thompson Falls." LaFriniere's stepmother later told police that, as she slowly drove by on the way to work that evening, she saw Wood's vehicle parked in front of LaFriniere's home with Wood "running back and forth between her vehicle and the residence." Two of LaFriniere's neighbors later told police that they heard gunshots in the neighborhood "during the evening hours" of May 2nd.

¶6 LaFriniere did not show up for work the following morning, May 3rd. Later that afternoon, a coworker stopped by LaFriniere's home to check on him, eventually found him dead face-down under a piece of plywood in his driveway, and then called 911. Police responded and found LaFriniere dead with multiple gunshot wounds. A subsequent autopsy confirmed those gunshot wounds as the cause of death, but the medical examiner found and recovered only one bullet or fragment from LaFriniere's body—a .38 caliber round in one of his hands.

¶7 Police later discovered and verified that Wood had recently owned a .38 Special revolver and ammunition which she purchased in March 2018 from a sporting goods store in Ronan, Montana, less than two months before the May 2nd shooting death of LaFriniere. When later questioned by police as to whether Wood had previously owned any guns, her boyfriend (Drew Stobie) initially answered no, but later recanted and acknowledged in that same interview that he was aware that she had previously bought a gun, but that he did not know that until Wood disclosed that to him several days after LaFriniere's death. Stobie elaborated that she then told him she later "threw [it] away" because she was "afraid of it." Police further ascertained that the cell phone number from which Wood received the May 2nd text message attributed to LaFriniere (stating he was "held up in Trout Creek") was

4

assigned to a TracFone[4] and was the same number from which the Sanders County Sheriff's Office received the anonymous May 2nd 911 call regarding the reported disturbance west of Thompson Falls. Subsequent forensic analysis obtained by police of available cell phone data indicated a consistent location "proximity relationship" between the TracFone and Wood's personal cell phone on the evening of May 2, 2018.

¶8 The State's charging affidavits further alleged that a Montana Highway Patrol trooper, who had lived in a camper on LaFriniere's property during the Wood-LaFriniere relationship, reported seeing "8 to 10 physical confrontations between [them]" in the past, many of which "became physical" with Wood as "the aggressor." The trooper recalled escorting the intoxicated Wood off the property, at which time she told the trooper, "I'm going to kill him."

¶9 In June 2020, over a year after she was initially charged with straight deliberate homicide, and following at least four prior trial continuances, the State moved for leave to file an Amended Information charging Wood "with the offense of deliberate homicide . . . *as specified in*" §§ 45-5-102(1)(a), *45-2-301*, and *-302*, MCA. (New code sections emphasized.) The motion's stated "purpose" was "to make clear that the State [was] also relying on . . . accountability as stated in" §§ 45-2-301 and -302, MCA, thus giving Wood "specific notice" of its alternative accountability theory.

---

[4] A TracFone is a relatively inexpensive cell phone with prepaid cellular service often used, *inter alia,* as a disposable cell phone incident to criminal activity.

¶10 Except for alteration of the form of one page 11 pronoun from "who" to "whom," however, the amended charging affidavit was no more than a verbatim restatement of the factual assertions set forth in support of the original straight or direct deliberate homicide charge. The only facts alleged in either affidavit regarding a third party with whom Wood *might conceivably* have been involved in the LaFriniere murder as an alleged accomplice for purposes of the State's alternative accountability theory referred to her boyfriend (Stobie), to wit:

> [While police searched her home under a search warrant,] Wood contacted her boyfriend Drew Stobie. Stobie arrived at Wood's residence and they both left. In the master bathroom connected to what appeared to be Wood's bedroom was writing on the mirror [which] stated "you are worth it! She will be home for good soon?" The "for good" portion was written below the main body of the text, with an arrow pointing upward to the main text. The writing reminded [the investigating DCI agent] of the contentious custody battle between [LaFriniere] and Wood over [their daughter] S.L.
>
> .   .   .
>
> During [a subsequent voluntary police] interview Stobie indicated that he and Wood had been dating for about 3 years. . . . [The agent] asked Stobie whether Wood owned any firearms. Stobie stated that he was unaware of Wood owning any firearms [but] stated that he owned guns. Stobie stated that it would surprise him if Wood owned a gun because [she] "doesn't like to be around guns." Stobie then changed his answers and stated that on May 7, 2018 (approximately 4 days after the homicide) Wood had told him that she had previously purchased a gun [but] did not tell him where she purchased the gun. Stobie stated that Wood told him that she "threw away" the gun because she was "afraid of it." Stobie stated that Wood said she did this four to five weeks prior to [LaFriniere's] death[,] . . . [and] that he was "super pissed" that she threw the gun away without selling it.[5]

---

[5] The affidavits further alleged that a police detective had "interviewed Wood's neighbor Henry Cheeseman" who had:

> three years earlier . . . been in a dating relationship with Wood. [He] stated that during that time Wood asked [him] if he would be willing to "take out" [LaFriniere]. Cheeseman stated that he took this to mean that Wood was

6

¶11 Wood objected to the motion to amend on the asserted grounds that: (1) the supporting affidavit "alleged no new facts" beyond those originally asserted in support of its March 2019 Information charging her with personally shooting and killing LaFriniere; (2) the State had not "provided any additional discovery that would support" the alternative theory; and (3) the State's "alternative theories of guilt" were in any event "inconsistent" due to the complete lack of any evidence indicating "that someone other than [Wood] shot and killed" LaFriniere. The State responded that its contemplated alternative guilt theories of criminal liability were not inconsistent because "Montana law makes no distinction between the principal or accessory of a crime." The District Court subsequently granted the motion without elaboration upon cursorily "find[ing] probable cause to believe that" Wood "committed the alleged offense." In pertinent part, the resulting July 31, 2020, Amended Information thus alternatively charged Wood with:

> committ[ing] the offense of Deliberate Homicide by purposely or knowing causing the death of . . . LaFriniere[] by shooting him with a firearm *or being legally accountable for the commission of the offense* . . . ([s]ee Mont. Code. Ann. §§ 45-2-301 and 45-2-302).

(Emphasis added.) The case proceeded to jury trial on January 14, 2021.

  1. State Evidence re Cause of Death and the Crime Scene.

¶12 At trial, the State presented expert testimony from the state medical examiner and a State Crime Lab ballistics technician that LaFriniere's death was caused by four gunshot

---

propositioning him to kill [LaFriniere]. Cheeseman told Wood that people "would go to prison" for committing such an act. Wood responded by saying "I know."
At trial, however, the State presented no testimony, evidence, or other reference to Cheeseman or his alleged statement.

7

wounds, with one .38 caliber round recovered from one of his hands, and no other bullets or fragments found in his body. The ballistics expert testified that the recovered round was a .38 caliber bullet that could have been fired from various handgun models, including a few semi-automatic 9mm handguns, but was most likely fired from a .38 Special or .357 Magnum revolver. Multiple crime scene investigators testified that no cartridge casings or other bullet fragments were found upon visual and metal detector searches of the vicinity. The owner of a sporting goods store in Ronan, Montana, testified that the unaccompanied Wood purchased a .38 Special revolver and multiple rounds of .38 caliber ammunition from his store on March 15, 2018. A state DCI agent testified that Wood initially told police that she did not own any firearms, but that in a subsequent search of her home, police found the sales receipt documenting her .38 Special and ammunition purchase from the Ronan store.

¶13     The coworker who first discovered LaFriniere's body on May 3, 2018, testified that she first saw it in his driveway under a thin sheet of plywood, a 2x6-inch board, and a shovel. A DCI agent testified that the sheet of plywood appeared to have come from a grassy area some 40 yards away, and that "whoever killed" LaFriniere likely placed the plywood and other items on top of his body. The agent further testified that a large pool of blood was found on the ground about 17 feet from LaFriniere's body. Multiple DCI agents testified, however, that no blood spatter or drag marks were found in the area. A blood stain pattern analysis expert testified that LaFriniere was probably "upright for a period of time" after sustaining his bleeding injuries, and then "either moved on his own or was moved to the position" where found, but that there was no indication on his clothing

8

or body that he had been dragged. The state medical examiner testified that LaFriniere "could have walked" after being shot, possibly as far as 17-18 feet, and that his clothes could have captured the blood, thus explaining the absence of any drag marks, blood trail, or spatter. On cross-examination, a DCI agent testified that he and another agent removed LaFriniere's body from the scene, and that he could not have moved it alone.

2. Timeline of Events—Evening of May 2, 2018.

¶14 The State presented testimony from two guests who attended the Pampered Chef party at Wood's home on the evening of May 2, 2018. Both testified that: (1) Wood's adult son and minor daughter S.L. were at home; (2) Wood received a text message from an unknown number claiming to be LaFriniere; (3) she appeared to try to reach him by phone; (4) she left home alone sometime between 7:00 and 7:30 p.m. with the stated intent to check and see whether he was at home; and (5) she was gone from home for least 30 minutes.

¶15 The State also presented witness testimony as to the 7:26 p.m. time of the anonymous 911 call regarding the reported disturbance west of Thompson Falls, gunshots heard in the vicinity of LaFriniere's home at approximately 7:35 p.m., and a large flock of birds then seen flying off in the same vicinity. LaFriniere's stepmother testified that, while slowly driving past LaFriniere's home on the way to work that evening, she saw his vehicle and Wood's vehicle parked in the driveway, and saw Wood "walking back and forth" between LaFriniere's shop and her car with LaFriniere not in sight.[6]

---

[6] LaFriniere's stepmother's work supervisor testified that she clocked-in to work at 7:40 p.m.

3. Expert Testimony re Involved TracFone and Wood's Cell Phone Location Data and Mapping.

¶16 The State presented testimony matching the anonymous May 2nd 911 call to a disposable prepaid TracFone, and matching the same TracFone to the text message sent to Wood in LaFriniere's name earlier that evening. A DCI agent testified that police did not recover the TracFone, but were able to obtain the corresponding cellular call and text message records, and location data, for the phone number assigned to the TracFone.

¶17 Over Wood's M. R. Evid. 702-03 objection to the threshold reliability and admissibility of the expert testimony, and underlying analytical methodology, the State presented the opinion testimony of Sy Ray and Mike Fegely regarding the relative physical locations of the TracFone and Wood's cell phone on the evening of May 2nd. Ray, the founder of the ZetX company, testified that the company provides "geolocation" "mapping and analytical software" for cellular phone "records [and] metadata" for use by law enforcement and numerous other government agencies.[7] Fegely testified that he was the ZetX data analyst who inputted the "raw" historical cell phone data obtained from the cellular service carrier for both phones (Verizon), and wi-fi/GPS location data available from Google for Wood's cell phone, into the ZetX TRAX mapping and analytical software. Fegely testified that the proprietary ZetX TRAX software then time-mapped the relative

---

[7] Ray further testified that this data may include "incoming and outgoing" phone calls, text or instant messages, "data connections" to third-party applications, and location data, i.e., either GPS coordinates or the distance between a device and the nearest cell site (tower or antennae), *inter alia*.

10

physical locations of the TracFone and Wood's cell phone on the evening of May 2nd.[8]

Over Wood's objection, the District Court also allowed the State to present a demonstrative video exhibit showing and explaining the relative locations of both cell phones as time-mapped by the TRAX software. Fegely supplemented the exhibit with his explanatory testimony.

¶18 Ray testified that there was only one cell phone tower in Thompson Falls, and that Verizon's RTT (real time tool) data for Wood's cell phone and the TracFone measured distance based on "how long it took the signal to travel from [the] cell [tower] to the mobile device [and] back to the cell [tower]." He explained that the TRAX software then mapped those distance measurements in an "arc" around the single cell tower, and thus could show only that the two cell phones were "somewhere in that arc" at any given time. According to Fegely, however, additional wi-fi/GPS-based data obtained by police from Google for Wood's cell phone allowed the TRAX software to more precisely map the physical locations of that phone in and around Thompson Falls at different times. He thus asserted that the more precise wi-fi/GPS Google location data for Wood's phone corroborated the Verizon-obtained RTT data for that phone. Similar wi-fi/GPS-based data was not available for the TracFone, and thus the provided ZetX TRAX mapping for that phone was based exclusively on the less accurate RTT data arc-mapping methodology only.

¶19 Based on his interpretation and analysis of the data sets "mapped" by the TRAX software, Fegely opined that when Wood's cell phone and the TracFone were both "active"

---

[8] Fegely also used cell phone data obtained by forensic extraction of Wood's cell phone to "corroborat[e]" the TRAX mapping.

during the pertinent times, "they [had] essentially identical location information," i.e., that they were "essentially" at the same location.[9] Bolstering and illustrating his analysis, Fegely further testified that the data indicated that a call placed on April 19, 2018, at approximately 10:30 p.m. from Wood's cell phone at a Missoula area location to TracFone's "customer service line" caused the TracFone to appear on the Verizon cellular network within "five minutes" in close proximity to Wood's phone. He asserted that fact was "significant" because it indicated the initial activation of the TracFone.[10] Fegely further asserted that April 19th location data available for both phones indicated that Wood's phone and the TracFone then traveled in close proximity together from Missoula to Wood's home in Thompson Falls, and that several other calls were thereafter made from Wood's cell phone to the TracFone customer service line.

¶20 Fegely testified that the next "significant dataset" after April 19th regarding relative cell phone locations indicated that, on the evening of May 2, 2018, the night of Wood's Pampered Chef event and LaFriniere's shooting death, Wood's phone and the TracFone were both initially located in close proximity at or near her home. He testified that the data analyzed by the TRAX software further indicated that:

(1) shortly after 7 p.m. Wood's phone and the TracFone began moving together in the same direction away from her home;

---

[9] However, Ray had previously testified that, based on a referenced "accuracy error," the TRAX software could map a phone's location "within a tenth of a mile or less" of the RTT "arc."

[10] Fegely testified that this was "the first activity" that constituted "mappable data" from the TracFone, though he conceded that records did contain TracFone data "going back" to April 1, 2018.

(2)     at approximately 7:28 p.m., the time the anonymous 911 call was made, Wood's cell phone and the TracFone were "in close proximity";

(3)     within a few minutes later there was no more mappable activity from the TracFone; and

(4)     after moving away from the location of the 911 call, Wood's cell phone remained stationary in the vicinity of LaFriniere's address approximately from 7:38 to 7:53 p.m.

On cross-examination, however, Fegely conceded that the location data analyzed by TRAX software could not establish who activated the TracFone, whether the TracFone and Wood's phone were "being carried by the same person," or if while earlier traveling to Missoula, the vehicle carrying Wood's phone "stopped long enough to pick" up or "drop someone off." When asked by defense counsel whether two people "traveling together on April 19th and on May 2nd" was a possible "alternative explanation" for the phones being in such close proximity, Fegely answered:

> I'm not saying [the phones] are in the same person's hands or even possession, but . . . within a car proximity. That certainly is an explanation that there could be more than one person. If you're saying could I suppose that there's more than one person with two devices together, well, of course I could say that's a possibility.

3.     State Evidence of Wood's Motive to Kill LaFriniere.

¶21     Multiple prosecution witnesses testified regarding Wood's tumultuous relationship with LaFriniere, particularly regarding their acrimonious child custody battle. LaFriniere's coworker testified that on May 2, 2018, when Wood picked-up S.L. from LaFriniere's workplace that afternoon, they engaged in a heated argument, followed by Wood's "very angry" departure. A DCI agent testified that while executing a search warrant after LaFriniere's death, police discovered a book in Wood's car with the phrase, "[LaFriniere]

13

gone, [S.L.] with me," written in the margin. Police found the related statements "You are worth it!" and "She will be home soon, for good" written in makeup on Wood's bathroom mirror.

        4.     State Evidence Regarding Wood's Boyfriend (Drew Stobie) as a Possible Third-Party Perpetrator or Co-Accomplice in the LaFriniere Killing.

¶22    At the time of LaFriniere's murder, Wood had been involved in a romantic relationship with Drew Stobie for about three years. One of the investigating DCI agents testified that he interviewed Stobie "on at least three occasions" as part of his homicide investigation: in May 2018 prior to Wood's arrest, after her arrest and their relationship had ended, and again in Fall of 2020 at which time he also searched Stobie's "garage, outbuildings and vehicles" pursuant to a search warrant. The agent testified that he obtained the search warrant based on his suspicion that the gun used to shoot LaFriniere may have been located in one of those locations.[11] Sometime prior to the initial interview in May 2018, the agent also learned that Stobie owned a particular 9mm semi-automatic handgun.

¶23    On cross-examination, the agent testified that he at no time made any attempt to ascertain Stobie's whereabouts on May 2, 2018, or to obtain permission or a warrant to search his phone, for DNA, fingerprints, or any other evidence of his possible involvement

---

[11] There is no record indication as to whether, or on what basis, the agent may have had sufficient particularized probable cause to justify issuance of that search warrant. Nor were either of those questions at issue here or below. In a related matter, Stobie disclosed at trial that, in the summer of 2020, two of Wood's defense counsel visited his home to investigate a "rumor" that the "gun in question" was then "in [his] shop in a brown paper bag." He testified that he gave them permission "to look and see if that was true," but that they "declined" after he told them that he had recently rearranged his shop and moved Wood's belongings to another location on his property.

in LaFriniere's death.  When asked why not, the agent answered that he never considered or viewed Stobie as a possible suspect.  When pressed further on that topic by defense counsel, the agent asserted:

> *There was not enough information or evidence to implicate Mr. Stobie* in this crime, *and there hasn't been*. . . .  There were *no leads or information that implicated Mr. Stobie* in this crime *and there hasn't been* throughout this case. . . .  In my mind, Danielle Wood was a suspect and Mr. Stobie was a witness.

(Emphasis added.)  On redirect, the prosecutor followed-up:

> [State]:    [H]as there *ever been any indication that Mr. Stobie had anything to do with this case*?
>
> [Agent]:  *No*, *never*.
>
> [State]:    Has the only person that you're aware of that's ever pointed a finger at Mr. Stobie been the defense counsel in this case?
>
> [Agent]:  Yes.

(Emphasis added.)

¶24    Further manifesting the State's lack of interest in Stobie as a suspect or accomplice in the shooting death of LaFriniere, the prosecution called him as a State's witness regarding his knowledge of Wood's gun ownership and use.  He also acknowledged that he owned a 9mm semi-automatic handgun, and that he and Wood occasionally went shooting together during their relationship.  He testified however, that he never heard Wood express any interest in purchasing a gun prior to LaFriniere's death, and that she did not disclose that she had previously "bought a handgun" until "two or three days" later, and then told him that she "threw it away in the trash."  Stobie further acknowledged that he initially told police in May 2018 that Wood did not own a gun in an attempt "to protect

15

her," but then recanted in the same interview and disclosed what Wood told him after LaFriniere's death. He said that he immediately recanted his initial misleading statement because "it was a very serious matter," he "was afraid," and, though he loved and "believed in" Wood, he did not want to leave "anything unturned." Stobie testified that at no point during his interactions with police did they give him any reason to believe that he was suspected of being involved in LaFriniere's death. When directly asked at trial whether he had any involvement in the matter, Stobie emphatically answered that he "most certainly did not," and "would have no reason to kill [LaFriniere] or anybody else."

¶25 On cross-examination, Stobie acknowledged that: (1) he occasionally traveled to Missoula with Wood during their relationship; (2) he bought a TracFone in Missoula and was using it in May 2018; (3) Wood had helped him purchase prepaid minutes for his TracFone "online"; and (4) he had observed Wood to be not very "physically fit" and "worse than poor" at "moving stuff around." After Stobie testified, the State recalled its Crime Lab ballistics expert who testified unequivocally that Stobie's 9mm handgun was not capable of firing the type of .38 caliber ammunition retrieved from LaFriniere's hand.

5. Wood's Post-Evidence Motion to Dismiss Due to Insufficiency of the Evidence.

¶26 After the State rested its case-in-chief, Wood did not offer any witness testimony or evidence in her defense. Before settling of jury instructions, however, she moved outside the presence of the jury for dismissal of both of the State's asserted theories of deliberate

16

homicide on the asserted ground, *inter alia*, that the State had presented insufficient evidence to prove his guilt under either theory.[12] The District Court denied the motion.

6. Jury Instructions and Verdict Form re State's Alternate Criminal Liability Theories.

¶27 As pertinent here, the District Court gave the following jury instructions regarding the State's alternative deliberate homicide and deliberate homicide by accountability theories:

No. 13 A person commits the offense of deliberate homicide as [charged] . . . if the person purposely or knowingly *causes the death* of another human being *or is legally accountable* for the commission of the offense of deliberate homicide.

No. 14 To convict the Defendant of deliberate homicide as [charged] . . . , the State must prove the following elements:

(1) That the Defendant *caused the death* of Matthew LaFriniere, a human being, *or was legally accountable* for causing the death of Matthew LaFriniere, a human being, and
(2) That the Defendant acted purposely or knowingly.[13]

If you find from your consideration of the evidence that *all of these elements* have been proved *beyond a reasonable doubt*, then you should find the Defendant guilty.

---

[12] *See* § 46-16-403, MCA (authorizing court dismissal upon of close of prosecution case-in-chief or evidence in toto if "the evidence is insufficient to support a finding or verdict of guilty"). Dismissal due to "insufficient evidence" is warranted "only if" when viewed "in the light most favorable to the prosecution" there is insufficient evidence "upon which a rational trier of fact could find [all] essential elements" of the charged offense(s) "beyond a reasonable doubt." *State v. Erickson*, 2014 MT 304, ¶ 20, 377 Mont. 84, 338 P.3d 598 (citing *State v. Rosling*, 2008 MT 62, ¶ 35, 342 Mont. 1, 180 P.3d 1102).

[13] Instruction No. 15 defined "purposely" as "[a] person acts purposely when it is the person's conscious object to cause such a result." Instruction No. 16 defined "knowingly" as "[a] person acts knowingly when the person is aware there exists the high probability that the person's conduct will cause a specific result."

If, on the other hand, you find from your consideration of the evidence that any of these elements has not been proved beyond a reasonable doubt then you should find the Defendant not guilty.

No. 18    A person is *legally accountable* for the *conduct of another* when either before or during the commission of an offense, and with *the purpose to promote or facilitate* such commission, the person *solicits*, *aids*, *abets*, *agrees or attempts to aid*, such *other person* in the *planning or commission* of the offense.

No. 19    To convict the Defendant of the offense of *Deliberate Homicide by being legally accountable* for the conduct of another, the State must prove the following elements:

(1)    The crime of Deliberate Homicide was committed; and

(2)    The Defendant, either before or during the commission of the offense of Deliberate Homicide, and *with the purpose to* promote or facilitate such commission, *aids*, *abets*, *agrees or attempts to aid*, such other person *in the planning or commission* of the offense of Deliberate Homicide.

If you find from your consideration of the evidence that *all of these elements* have been *proved beyond a reasonable doubt*, then you should find the Defendant guilty.

If, on the other hand, you find from your consideration of the evidence that any of these elements has not been proved beyond a reasonable doubt then you should find the Defendant not guilty.

No. 20    A person who is legally accountable for the conduct of another which is an element of an offense may be convicted upon proof that the offense was committed and that the person was so accountable, although the other person alleged to have committed the offense has not been prosecuted.

(Emphasis added.)

¶28    Wood requested a specific unanimity instruction, to wit:

[The State has] *two theories* [and] you have to be *unanimous* in *which theory you agree on*. . . .   My request would only be if we could add a second sentence in that said the State has charged a deliberate homicide [that] was committed . . . by shooting Matthew LaFriniere with a firearm *or being*

18

*legally accountable*, and to make sure that [those are] *the separate acts* that we're talking about that the jury has to be unanimous on.

(Emphasis added.) The prosecutor initially equivocated that "I'm not sure you need [unanimity] in the instruction[s]" because it's only "one charge," but then conceded that the State wanted "to [err] on the side of caution" and *thus agreed* that "[i]f the defendant wants to propose [a unanimity] instruction, mean[ing] all 12 people decide the case *on one theory*, . . . *I don't object* to that." (Emphasis added.) The prosecutor further elaborated:

[W]hat the defense is talking about is that this be unanimity with regard to the acts. . . . I think *accountability's been weak*, and *I'm not objecting to* the [unanimity] instruction being given and placing that *burden on the State* of unanimity with regard to *accountability theory* versus princip[als] theory.

(Emphasis added). The State reversed course and objected, however, to the precise special unanimity language later proposed by defense counsel. The District Court ultimately gave the following unanimity instruction:

No. 21 The Defendant is charged with the offense of Deliberate Homicide . . . [b]ut in order to find the Defendant guilty, *all the jurors must agree* that the *Defendant committed the same act or acts*. It is not necessary that the particular act or acts committed so agreed upon be stated in the verdict.

(Emphasis added.)

¶29 Wood proposed a somewhat conforming verdict form that would have specifically required the jury to designate upon which alternate theory of criminal liability it may find her guilty, if any, whether for personally causing LaFriniere's death or by accountability. The defense-proposed verdict form thus provided for a unanimous jury verdict on either "the charge of Deliberate Homicide" *or* "the alternative charge of Accountability to

19

Deliberate Homicide." The District Court rejected the defense-proposed verdict form and instead gave the jury the State's proposed verdict form stating:

> We the jury . . . enter the following unanimous verdict: [o]n the charge of DELIBERATE HOMICIDE, we . . . find the Defendant [either] NOT GUILTY or GUILTY [as marked].

7. State's Theory of Guilt on Closing Argument.

¶30 During closing argument, the prosecutor referenced the State's alternative accountability theory as a jury conviction option, but made no accompanying factual argument on that theory, to wit:

> There's been some discussion about alternative charges. We have one charge, deliberate homicide. And you can find Ms. Wood guilty of deliberately killing Mr. LaFriniere, pulling the trigger. You may find that the evidence overwhelmingly establishes that; or you may find that she participated pursuant to the accountability statute.
>
> And those statutes or those instructions are number 18 if you want to take note of those. [Instruction No.] 18 says, a person is legally accountable for the conduct of another when either before or during the commission of an offense and with a purpose to promote or facilitate such commission the person assists, aids, abets, agrees or attempts to aid such other person in a commission of the offense. And then [Instruction No.] 19, the next instruction, sets forth how that is set out. [Instruction No.] 20 states that a person is legally accountable for the conduct of another when it's the element of an offense, may be convicted upon proof that the offense was committed and that the person was so accountable; although—although the other person alleged to have committed the offense has not been prosecuted.
>
> .   .   .
>
> Ladies and gentlemen, I would ask that you consider this: with those photographs I've shown you today and the last couple of weeks of . . . [*LaFriniere being*] *shot* with bullets was the result of Ms. Wood's wildest dreams coming true, and I would ask that you *hold her accountable for that and find her guilty of deliberate homicide*. Thank you.

(Emphasis added.) On rebuttal, the State similarly closed:

20

Ladies and gentlemen, the verdict form says guilty of deliberate homicide or not guilty of deliberate homicide. The instructions tell you how to get to those places. That the *accountability where you find that she was a participant*, she *could be found guilty of deliberate homicide*, . . . [or] *deliberate homicide* as you would normally think of it, and that is that on May 2nd, Danielle Wood . . . drives over there and kills . . . LaFriniere. And *that's the verdict the State would ask you to render* in this case. Thank you so much for your time.

(Emphasis added.) The State thus presented no evidence or argument even suggesting that some third party shot and killed LaFriniere, or that Wood only participated in the killing to some lesser extent with some third party who also actively participated in it. Upon deliberation, the jury returned a "guilty" verdict on the indiscriminate verdict form provided. The District Court ultimately sentenced Wood to a 100-year term of imprisonment at the Montana State Women's Prison, *inter alia*. Wood timely appeals.

**STANDARD OF REVIEW**

¶31 We review trial court rulings regarding criminal jury instructions for an abuse of discretion as to whether they fully and fairly instructed the jury on the applicable law. *State v. Doyle*, 2007 MT 125, ¶ 66, 337 Mont. 308, 160 P.3d 516. We review trial court rulings regarding the form and substance of jury verdict forms for an abuse of discretion as to whether, when read in conjunction with the pertinent jury instructions, the verdict form at issue was sufficiently clear to allow the jury to unanimously and unambiguously declare the guilt or innocence of the accused regarding the charged offenses or theories of criminal liability submitted for jury determination. *See State v. Frydenlund*, 2024 MT 187, ¶¶ 11-24, 418 Mont. 27, 555 P.3d 247; *Demontiney v. Mont. Twelfth Jud. Dist. Ct.*, 2002 MT 161, ¶¶ 19-21, 310 Mont. 406, 51 P.3d 476; *State v. Weaver*, 1998 MT 167, ¶¶ 37-38,

21

290 Mont. 58, 964 P.2d 713; *State v. Weldy*, 273 Mont. 68, 76-79, 902 P.2d 1, 6-7 (1995); *State v. Kills on Top*, 243 Mont. 56, 96, 793 P.2d 1273, 1300 (1990); *People v. Davenport*, 710 P.2d 861, 877 (Cal. 1985). As pertinent here, a lower court abuses its discretion only if it either acts arbitrarily, without conscientious judgment, or exceeds the bounds of reason, resulting in substantial injustice, or the given instructions or verdict form are based on an erroneous conclusion or application of law. *See State v. Wilkes*, 2021 MT 27, ¶ 16, 403 Mont. 180, 480 P.3d 823; *State v. Pelletier*, 2020 MT 249, ¶ 12, 401 Mont. 454, 473 P.3d 99. However, we review lower court rulings regarding the sufficiency of the trial evidence to sustain a charged offense or other theory of guilt de novo for whether, upon our independent review of the evidentiary record "in the light most favorable to the prosecution, any rational trier of fact could have found [all] essential elements of" required proof proven "beyond a reasonable doubt." *State v. Erickson*, 2014 MT 304, ¶ 20, 377 Mont. 84, 338 P.3d 598 (citing *State v. Rosling*, 2008 MT 62, ¶ 35, 342 Mont. 1, 180 P.3d 1102); *State v. McCarthy*, 2004 MT 312, ¶ 46, 324 Mont. 1, 101 P.3d 288 (citing *State v. Ross*, 269 Mont. 347, 360, 889 P.2d 161, 169 (1995)).

**DISCUSSION**

¶32   1.   *Whether the District Court erroneously submitted the State's alternative theory of criminal liability (Accountability for Deliberate Homicide) to the jury without sufficient supporting evidence?*

¶33   As primarily charged here, a person commits the offense of deliberate homicide by "purposely or knowingly caus[ing] the death of another human being." Section 45-5-102(1)(a), MCA. As distinctly charged by Information as an alternative theory of criminal liability here, an accused is responsible for the conduct of another if the

22

person "is legally accountable for the conduct" of the other person "as provided in" § 45-2-302, MCA. As more specifically alleged and submitted for jury determination here, "[a] person is legally accountable for the conduct of another" if, with "purpose to promote or facilitate the commission" of the charged offense, the person:

> solicits, aids, abets, [or] agrees or attempts to aid *the other person* in the planning or commission of the offense.

Section 45-2-302(3), MCA (emphasis added). As a "material element" of proof of a charged offense or other theory of guilt, conviction requires proof of "a voluntary act." Section 45-2-202, MCA. As pertinent here, a person may be "convict[ed]" of being "legally accountable for the criminal conduct of another" only "*upon proof*" that the *subject* "*offense was committed*," even though "the other person claimed to have committed the offense" is or was not "prosecuted or convicted" for commission of that offense. Section 45-2-303, MCA.

¶34    The State cites *State v. Tower*, 267 Mont. 63, 66-67, 881 P.2d 1317, 1319-20 (1994), for the proposition that deliberate homicide by accountability, as defined by §§ 45-5-102(1)(a), 45-2-301, and -302(3), MCA, is *not* a distinct offense apart from direct deliberate homicide as defined by § 45-5-102(1)(a), MCA. Building on that assertion, the State further asserts, in essence, that it thus follows that deliberate homicide by accountability, as defined by §§ 45-2-301, -302(3), and 45-5-102(1)(a), MCA, does not have to be separately listed or referenced on the *jury verdict form* when, as here, charged or asserted as an alternative to direct deliberate homicide as defined by § 45-5-102(1)(a), MCA. *Tower* supports neither of those propositions.

23

¶35    In pertinent part, *Tower* narrowly held only that constitutionally guaranteed due process of law, and § 45-1-102(c), MCA (*inter alia*, a general "purpose[] of" Title 45 statutes defining criminal offenses is to provide the accused "fair warning of the nature of the conduct declared to constitute an offense"), does not require *the charging Information* to specify an "accountability theory" of criminal liability separate or distinct from specification of the primary offense for which the accused is allegedly accountable. *Tower*, 267 Mont. at 66-67, 881 P.2d at 1319-20.  Unlike here, *Tower* did not involve a scenario where the State distinctly charges or alleges that the accused is legally accountable for aiding or abetting another in the commission of an offense *as an alternative to* charging that the accused directly committed that offense.  *See Tower*, 267 Mont. at 66-67, 881 P.2d at 1319-20.  Nor did *Tower* consider, as at issue here, whether the jury must correspondingly be instructed to distinctly consider, determine, and declare whether the State has proven all elements required for proof of an alternatively alleged theory of guilt by accountability.  *See Tower*, 267 Mont. at 66-67, 881 P.2d at 1319-20.  *Tower* is thus clearly distinguishable and of no consequence here.

¶36    We have long recognized and required that the State must prove beyond a reasonable doubt all essential elements defining and required for conviction of a charged or otherwise asserted theory of legal accountability for the criminal conduct of another in accordance with §§ 45-2-302(3) and -303, MCA.  *In re B.W.*, 2014 MT 27, ¶¶ 19-21, 373 Mont. 409, 318 P.3d 682 ("to hold one accountable for the acts of another, the State must prove the elements of accountability beyond a reasonable doubt"—citing *State v. Doyle*, 2007 MT 125, ¶ 55, 337 Mont. 308, 160 P.3d 516); *Doyle*, ¶ 55 (for conviction on

24

"deliberate homicide by accountability" State must prove "beyond a reasonable doubt" that the accused "aided or abetted" another "in the planning or commission of deliberate homicide" with "the purpose to promote or facilitate [the] commission of deliberate homicide"); *State v. Gollehon*, 262 Mont. 1, 21-22, 864 P.2d 249, 261-62 (1993) ("deliberate homicide by accountability requires" proof of "a deliberate homicide and that" the person accused of accountability "acted with common purpose before or during the [subject] homicide"); *State v. Lantis*, 1998 MT 172, ¶ 33, 289 Mont. 480, 962 P.2d 1169 (§§ 45-2-301, -302(3), and 45-5-102(1)(a), MCA, require the State to prove all essential elements of "deliberate homicide by accountability . . . beyond a reasonable doubt"). *Accord State v. Lyons*, 254 Mont. 360, 363-66, 838 P.2d 397, 399-401 (1992); *State v. Downing*, 240 Mont. 215, 217-20, 783 P.2d 412, 413-15 (1989).[14] Thus, notwithstanding that due process of law does not require alleged criminal liability by accountability to be set forth as a separate *offense* in the initial Information as narrowly at issue in *Tower*, a conviction for accountability to deliberate homicide in accordance with §§ 45-2-302(3), -303, and 45-5-102(1)(a), MCA, requires the State to distinctly prove beyond a reasonable doubt all pertinent elements specified by §§ 45-2-302(3) and -303, MCA, as they relate to

---

[14] *See similarly State v. Davis*, 2012 MT 129, ¶¶ 10-15, 365 Mont. 259, 279 P.3d 162 (proof of accountability for another's commission of subject offense requires proof of requirements of § 45-2-302(3), MCA, at issue beyond a reasonable doubt—citing *State v. Newman*, 2005 MT 348, ¶ 19, 330 Mont. 160, 127 P.3d 374 (U.S. Const. amend. XIV "Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of *every fact necessary* to" satisfy the required elements of proof of the charged offense—citing *In re Winship*, 397 U.S. 358, 361-64, 90 S. Ct. 1068, 1071-73 (1970) (U.S. Const. amend. XIV procedural due process guarantee requires state proof of all essential elements of a charged criminal offense beyond a reasonable doubt standard))).

deliberate homicide, as defined by § 45-5-102(1)(a), MCA. *See* §§ 45-2-302(3) and -303, MCA; *In re B.W.*, ¶¶ 19-21; *Doyle*, ¶ 55; *Gollehon*, 262 Mont. at 21-22, 864 P.2d at 261-62; *Lantis*, ¶ 33.

¶37 When, as here, the State charges an accused with personally committing an offense or, in the alternative, that she is at least legally accountable for it by aiding or abetting another in the commission of that offense, the trial court must distinctly, fully, and fairly instruct the jury regarding the essential elements of required proof, and the State's corresponding burden of proof, for each of those alternative theories of criminal liability and guilt. *See State v. Daniels*, 2019 MT 214, ¶¶ 32 and 34, 397 Mont. 204, 448 P.3d 511 (the fundamental "right[s] to trial by jury" and "due process of law . . . guaranteed by" U.S. Const. amends. VI and XIV, and Mont. Const. art. II, §§ 17, 24, and 26, "necessarily encompass[] the right[s] to a fair trial, the right to have the state prove every element of a charged offense beyond a reasonable doubt, and the presumption of innocence," thus requiring the trial court "to instruct the jury on every issue or theory finding support in the evidence, and to accurately and correctly state the law applicable in [each] case"—citations and internal punctuation omitted); *State v. Magruder*, 234 Mont. 492, 497, 765 P.2d 716, 719 (1988) ("jury has been properly instructed" if "the instructions given . . . fully and fairly convey the elements of [the] criminal" conduct alleged—citing *State v. Collins*, 178 Mont. 36, 45, 582 P.2d 1179, 1184 (1978)). *See also* §§ 45-2-302(3) and -303, MCA; *In re B.W.*, ¶¶ 19-21; *Doyle*, ¶ 55; *Gollehon*, 262 Mont. at 21-22, 864 P.2d at 261-62; *Lantis*, ¶ 33, *supra*. As clearly manifest by the explanation given in its motion for leave to file an amended Information, the language of its resulting Amended Information, and its

26

corresponding jury instruction settlement proposals and concessions, the State clearly understood and recognized below that fundamental procedural fairness, i.e., procedural due process, required that the jury be distinctly instructed, to the extent supported by the trial evidence, on each of its alternatively charged theories of criminal liability.

¶38 The alternative deliberate homicide by accountability convictions at issue in *Doyle*, ¶¶ 55-59; and *Gollehon*, 262 Mont. at 5-9, 864 P.2d at 252-54, are analytically illustrative to the extent that, like here, the defendants in those cases were alternatively charged with deliberate homicide and accountability to deliberate homicide by aiding or abetting another in the commission of violent beating deaths involving multiple simultaneous assailants, under circumstances where it was not clear whether any of them were the primary perpetrator or cause of the decedent's death. In *Doyle*, we held that sufficient evidence supported the alternative deliberate homicide by accountability conviction upon the State's proof that: (1) the decedent was found dead on the floor of his apartment due to fatal blunt force trauma injuries; (2) the accused and two third parties, who had previously pled guilty to deliberate homicide by accountability after being similarly alternatively charged, went to the decedent's apartment to confront him regarding an alleged offensive lie; (3) one of the third parties repeatedly "punched and kicked" the decedent and held a knife to his throat while he was sitting in a chair; (4) the accused simultaneously punched the decedent while he was sitting in the chair; and (5) the other third party then tipped the chair over, dumping the beaten decedent to the floor where he was later found dead. *Doyle*, ¶¶ 9-14 and 55-59. In affirming the alternative accountability to deliberate homicide by aiding or abetting another in the commission of the homicide, we held that those facts supported a jury

27

inference that the accused concurrently aided one or both of the other two in the beating death of the decedent. *Doyle*, ¶¶ 9-14 and 55-59 (*inter alia* noting the contributing "active role" of the accused in causing the decedent's death).

¶39 In *Gollehon* and *State v. Turner*, 262 Mont. 39, 864 P.2d 235 (1993), two prison inmates were alternatively charged with deliberate homicide and accountability for deliberate homicide by aiding or abetting each other in the joint baseball bat beating death of another inmate in the Montana State Prison yard. *Gollehon*, 262 Mont. at 5-9, 864 P.2d at 252-54; *Turner*, 262 Mont. at 42-46, 864 P.2d at 237-39. Upon a joint trial, each defendant was alternatively convicted of accountability for deliberate homicide by concurrently aiding or abetting the other in the beating death of the decedent. *Gollehon*, 262 Mont. at 5-9, 864 P.2d at 252-54; *Turner*, 262 Mont. at 42-46, 864 P.2d at 237-39. At trial and on appellate review, each minimized their respective roles in and contributions to the joint baseball bat beating death of the decedent in relation to the role and contribution of the other. *See Gollehon*, 262 Mont. at 5-9 and 20-22, 864 P.2d at 252-54, 260-63, and 264-66 (affirming district court application of § 45-2-302(3), MCA, for purposes of death penalty aggravating factors review and that trial evidence manifested that both defendants repeatedly struck the deceased about the "head and trunk" with baseball bats); *Turner*, 262 Mont. at 42-46, 50-51, 54, and 58-60, 864 P.2d at 236-39, 242, 244, and 247-48 (affirming death penalty on proportionality review). As to the State's strategy of alternatively charging deliberate homicide, and accountability to deliberate homicide by concurrently aiding or abetting each other in the commission of the deliberate homicide, we recognized and held as pertinent that:

[the given] instructions clearly and correctly instruct the jury that the offense of *deliberate homicide by accountability requires a deliberate homicide and that the defendant(s) acted with common purpose before or during the homicide.* The jury did not find Gollehon not guilty of deliberate homicide, but only found he did not act *alone* during the crime. A charge of deliberate homicide by *accountability allowed* the *jury to convict both* men *involved in the deliberate homicide without having to . . . determin[e] . . . who struck the fatal blow*.

.  .  .

Gollehon and Turner were [both] convicted of deliberate homicide by accountability. Both . . . were adjudged to have acted in a common plan to kill [the decedent], *regardless* of *who struck the fatal blow. . . .* Gollehon's argument that the crime of "accountability" is a separate crime is not correct. The State charged *accountability* for deliberate homicide so that the *jury could convict* if they determined [they] *aided and abetted each other* in the murder.

*Gollehon*, 262 Mont. at 20-21, 864 P.2d at 261-62 (emphasis added).

¶40    Thus in sum, accountability to deliberate homicide by aiding or abetting another in the commission of a deliberate homicide as specified in §§ 45-2-302(3) and -303, MCA, is neither a technically separate and distinct "offense" apart from direct deliberate homicide as defined by § 45-5-102(1)(a), MCA, nor does it require proof of who actually "struck" the literal or figurative "fatal blow" as between the alleged *concurrently acting accomplices*. *Gollehon*, 262 Mont. at 20-21, 864 P.2d at 261-62; *see similarly Doyle*, ¶¶ 55-59. However, as specified in §§ 45-2-302(3) and -303, MCA, as applied to § 45-5-102(1)(a), MCA, accountability to deliberate homicide by aiding or abetting another requires proof beyond a reasonable doubt that: (1) a deliberate homicide occurred, and (2) the accused and some other person or persons affirmatively acted with and *in furtherance of* a "*common purpose*" before or during the homicide to aid or abet the

29

commission of a deliberate homicide. *See Gollehon*, 262 Mont. at 20-21, 864 P.2d at 261-62 (emphasis added); *Doyle*, ¶¶ 55-59; §§ 45-2-302(3) and -303, MCA.

¶41    In that regard, as a matter of fundamental fairness (i.e., procedural due process), a trial court may not instruct a jury on any charged offense or other asserted theory of guilt unless the trial evidence, viewed in the light most favorable to the prosecution, includes a minimally sufficient basis upon which the jury could reasonably find that all elements required for conviction have been proven beyond a reasonable doubt. *See State v. Charlo-Whitworth*, 2016 MT 157, ¶ 13, 384 Mont. 50, 373 P.3d 845 ("jury instructions must be applicable to the case"—"there must be" a sufficient "basis in the facts or evidence for presenting the law to the jury"); *Erickson*, ¶ 20 (standard of review of § 46-16-403, MCA, dismissals due to insufficiency of the evidence for conviction—citing *Rosling*, ¶ 35); *McCarthy*, ¶ 46 ("standard of review of sufficiency of evidence to sustain a conviction"); *State v. Charlo*, 226 Mont. 213, 218-19, 735 P.2d 278, 281 (1987) ("[a] jury instruction may be given" only when "relevant to evidence or issues in a case" and "supported either by some evidence or some logical inference from other evidence presented at trial"); *Busta v. Columbus Hosp.*, 267 Mont. 342, 373, 916 P.2d 122, 140 (1996) ("the only purpose . . . properly served" by jury instruction "is to assure a decision consistent with the evidence and the law"). *See also Daniels*, ¶¶ 32 and 34, *supra*; *State v. Kaarma*, 2017 MT 24, ¶ 25, 386 Mont. 243, 390 P.3d 609 (citations omitted). "[At] the close of the prosecution's evidence" or "the close of all the evidence," the trial court, *sua sponte* or on motion, "may . . . dismiss" a charged offense or other asserted theory of criminal liability if the trial evidence "is insufficient to support a finding or verdict of

30

guilty." Section 46-16-403, MCA.[15] As a preliminary matter here, we agree with the State's assertion that proof of accountability by aiding or abetting another in the commission of the subject offense does not necessarily require proof of the identity of a third party alleged by the State to have committed the crime. *See* §§ 45-2-302(3) and -303, MCA. However, as specified in §§ 45-2-302(3) and -303, MCA, proof of legal accountability by aiding or abetting another in the commission of an offense necessarily requires proof beyond a reasonable doubt that: (1) the charged offense occurred regardless of who committed it or who was primarily responsible in its commission, and (2) the accused and some other person or persons affirmatively acted with and *in furtherance of* a "*common purpose*" before or during to contributorily aid or abet the commission of that offense. *See Gollehon*, 262 Mont. at 20-21, 864 P.2d at 261-62 (emphasis added); *Doyle*, ¶¶ 55-59. *See also* § 45-2-302(3), MCA ("[a] person is legally accountable for the *conduct of another* when . . . the person . . . aids, abets, . . . or attempts to aid the *other person in the* . . . *commission of* the [subject] offense"—emphasis added); § 45-2-303, MCA (a person "may be convicted" of being "legally accountable for the *conduct of another*" on "proof that the *offense was committed*" even if "the *other person* [alleged] *to have committed the offense* has not been prosecuted or convicted"—emphasis added).

¶42 Here, unlike in *Gollehon* and *Doyle*, the State presented no evidence or argument at trial even suggesting that some third party shot and killed the decedent LaFriniere, or that Wood actively assisted some other person in the planning or commission of the shooting

---

[15] *See also Erickson*, ¶ 20 (standard of review of § 46-16-403, MCA, dismissals due to insufficiency of the evidence for conviction—citing *Rosling*, ¶ 35).

31

of LaFriniere, with and in furtherance of *their* common purpose to cause his death. Unlike in *Gollehon* and *Doyle*, the State merely pointed out Instruction Nos. 18-20 authorizing the jury to alternatively find that, if Wood did not personally shoot LaFriniere, she somehow acted in concert with someone else with the purpose to cause his shooting death.

¶43 On appeal, the State asserts that the trial evidence (i.e., Wood's recent purchase of a gun and accompanying .38 caliber ammunition, the text message/TracFone correlation, the cell phone/TracFone location proximity, and the .38 round recovered from LaFriniere's hand) were sufficient to support its alternative accountability theory based on permissible jury inferences that Wood purchased and provided the murder weapon to the actual shooter, and then made a "diversionary 911 call" to aid the shooter in avoiding detection and apprehension at the scene. The problem with that argument, however, is that the State made no such argument either to justify submission of the accountability charge to the jury in the first instance, or to the jury in support of an alternative accountability conviction in the second. Rather, the State asserts its alternative accountability theory of proof for the first time on appeal. Moreover, even if *arguendo* the State had contemplated and asserted any such alternative accountability theory below, still conspicuously missing in the chain of proof is any evidence upon which the jury could have reasonably inferred, without reliance on unsupported speculation, that some other person (i.e., the phantom shooter) either was in fact present at the crime scene to shoot LaFriniere, or in fact before-hand or concurrently collaborated or acted in common purpose with Wood to shoot LaFriniere to death. The State's novel jury inferences asserted for the first time here are further wholly inconsistent with: (1) the unrebutted testimony *elicited by the State* from Wood's boyfriend

32

(Stobie), in support of its primary deliberate homicide theory, that he did not know that Wood had owned a gun until she disclosed that to him several days after the murder; (2) unrebutted testimony *elicited by the State* from its investigating DCI agent that there was no evidence or reason upon which to believe that Stobie had any involvement as a suspect or participant in the LaFriniere shooting; and (3) the State's related concession on appeal that it effectively *disclaimed* at trial "that anyone else was involved" in the planning or shooting of LaFriniere.

¶44 The State further asserts on appeal that, even if there was insufficient evidence to convict, a jury instruction on its alternative accountability theory was still necessary and proper to allow the State to rebut the speculative defense assertion that someone else must have shot LaFriniere, since Wood did not. However, in accordance with the above-cited authorities, jury instruction and consideration of a state-asserted theory of criminal guilt is proper in accordance with an accused's constitutionally guaranteed right to due process of law only if supported by record evidence sufficient to sustain a conviction on all required elements of proof for that theory. The State provided no such evidence here. Nor has the State cited any authority, or articulated any cognizable legal justification, supporting its proposition that jury instruction on an otherwise unsupported accountability theory is permissible to allow the State to "rebut" a similarly unsupported defense assertion of a phantom third-party perpetrator. For the foregoing reasons, we hold that the District Court erroneously submitted the State's alternative deliberate homicide by accountability theory for jury consideration and determination.

¶45     2.    *Whether the District Court erroneously provided a verdict form that did not allow the jury to unambiguously declare the guilt or innocence of the accused regarding each of the charged offenses or theories of criminal liability?*

¶46     While trial courts have discretion regarding the form and substance of jury verdict forms, the verdict form in a criminal case must, when read in conjunction with the pertinent jury instructions, be sufficiently clear to allow the jury to unanimously and unambiguously declare its verdict on the guilt or innocence of the accused regarding the charged offenses or theories of criminal liability submitted for jury determination. *See Frydenlund*, ¶¶ 11-24; *Demontiney*, ¶¶ 19-21; *Weaver*, ¶¶ 37-38; *Weldy*, 273 Mont. at 76-79, 902 P.2d at 6-7; *Kills on Top*, 243 Mont. at 96, 793 P.2d at 1300; *Davenport*, 710 P.2d at 877. As a preliminary matter here, aside from Wood's assertion that the State's alternative deliberate homicide by accountability theory should not have been submitted for jury consideration in the first place, she does not dispute on appeal the substantive correctness of jury Instruction Nos. 13-14, 18-21, and 25 regarding the required elements of proof, state burden of proof, and jury unanimity. We will assume those instructions were substantively correct without further analysis or comment.

¶47     However, while we assume that the jury was correctly instructed regarding the legal requirements for conviction on the State's alternative theories of guilt, the District Court rejected a defense-proposed verdict form that would have provided for a distinct jury declaration of verdict on each of those alternatives in favor of a verdict form that simply stated:

> We the jury . . . enter the following unanimous verdict:  [o]n the charge of DELIBERATE HOMICIDE, we . . . find the Defendant

34

_____
     Write NOT GUILTY or GUILTY above.

(Double spacing omitted.)  In form and substance, the provided verdict form was a single question, general verdict form that was facially vague or ambiguous to the extent that it referred only to the undifferentiated "charge of deliberate homicide" in a case where the accused was alternatively charged with committing distinct variants of deliberate homicide, the second of which had additional proof requirements not included in the first.

¶48    On review of a general "guilty" verdict when the jury has been correctly instructed on the requirements for conviction on the subject offense, we must assume that the jury unanimously found that every fact required for proof of the referenced offense was proven beyond a reasonable doubt, whether directly or upon reasonable inference from record facts.  *See State v. Doney*, 194 Mont. 22, 33-34, 636 P.2d 1377, 1384 (1981) (citing *State v. Meader*, 184 Mont. 32, 43, 601 P.2d 386, 392 (1979) (citing *State v. Steward*, 151 Mont. 551, 556-57, 445 P.2d 741, 745 (1968))).  In such case, we will generally overlook, as harmless error, errors and deficiencies on the face of a verdict form if:

(1)    the jury was properly instructed on the subject offense(s); and

(2)    the jury's declared verdict on each such offense is clearly and unambiguously ascertainable on the face of the verdict form, when read in context of the jury instructions and corresponding evidence and arguments of counsel.

*See State v. Schmidt*, 2009 MT 450, ¶¶ 34-40, 354 Mont. 280, 224 P.3d 618 (holding that erroneously deficient general verdict form providing for legally impossible or inconsistent jury verdicts on alternative counts of deliberate homicide and mitigated deliberate homicide was harmless error when read in context of the count-discriminating jury

instructions—distinguishing similar verdict form deficiency that was reversible error in *Demontiney*, ¶¶ 19-21, *infra*); *State v. Billedeaux*, 2001 MT 9, ¶¶ 25-28, 304 Mont. 89, 18 P.3d 990 (erroneous omission of "accountability" in verdict form reference to Count I deliberate homicide where accused was alternatively charged with felony-murder subvariant of deliberate homicide and accountability to deliberate homicide harmless where jury was properly instructed on distinct elements of each alternative charge, another instruction similarly referred to subject charge as accountability to deliberate homicide in contrast to deliberate homicide (felony murder), and trial evidence and multiple prosecutor and defense counsel references to subject charge as accountability to deliberate homicide "left no doubt" that the "Count I" incompletely referenced on verdict form was accountability for deliberate homicide). *See similarly Daniels*, ¶¶ 35 and 39 (asserted erroneous verdict form omission of correct reference to alternative and lesser-included offenses at issue "implicated" accused's "fundamental" due process rights under U.S. Const. amends. VI and XIV, and Mont. Const. art. II, §§ 17, 24, and 26, but harmless where jury convicted on primary charged offense and did not reach those alternatives).

¶49     We will not find such verdict form errors and deficiencies harmless under other circumstances, however. *See Weaver*, ¶¶ 37-38 (reversible error where accused charged and convicted of two of multiple-charge sexual assaults without required special unanimity instruction for verdict on same particular factual predicates where charged sexual assaults were based on a series of unrelated incidents over a period of years); *Demontiney*, ¶¶ 19-21 (reversible error where deliberate homicide and mitigated deliberate homicide theories submitted to jury, mitigated homicide required proof of all elements of deliberate

36

homicide plus an additional element not included in deliberate homicide, and jury returned "logically impossible" verdict on face of undiscerning verdict form by inconsistently acquitting on deliberate homicide and then proceeding to convict on mitigated deliberate homicide); *Weldy*, 273 Mont. at 71-72 and 76-79, 902 P.2d at 3 and 6-7 (reversible error where accused charged with two distinct variants of sexual misconduct based felony assault, jury adequately instructed on distinct elements of each charged variant and related specific unanimity/fact-predicate requirement, but nonetheless unclear from general undifferentiated verdict form reference to "felony assault" as to which charged variant of felony assault the jury found accused "guilty," whether "either or both").

¶50     Here, similar in pertinent essence to the reversible verdict form deficiencies in *Weldy* and *Demontiney*, *supra*, the jury was presumably adequately instructed on the distinct requirements for conviction on each of the alternatively charged variants of deliberate homicide.  Further, as in *Weldy*, the general verdict form here gave the jury only one choice—guilty or not guilty of undifferentiated "deliberate homicide."  Due to the above-noted dearth of State evidence and argument at trial in support of its alternative deliberate homicide by accountability theory, it is likely but not certain, unlike in *Billedeaux*, *supra*, that the jury unanimously found Wood guilty of direct deliberate homicide.  Moreover, unlike in *Billedeaux*, *Schmidt*, and *Daniels*, *supra*, the facially vague and ambiguous verdict form here, which generally referred only to a single undifferentiated deliberate homicide count in a multi-variant deliberate homicide case, is further compounded by the District Court's erroneous submission to the jury of the State's unsupported alternative accountability theory in the first instance.  Unlike in *Billedeaux*,

37

*Schmidt*, and *Daniels*, the wholly unsupported, though substantively correct, jury instructions regarding the alternative accountability theory not only should have not been placed before the jury in the first instance, but were then distinctly pointed out by the State twice in closing argument, and again on rebuttal, as an option if the jury could not unanimously find the State's evidence sufficient to support its primary theory of criminal liability and guilt.

¶51 Accordingly, we must apply our non-structural harmless error standard, *see State v. Van Kirk*, 2001 MT 184, ¶¶ 38-39, 40, and 46, 306 Mont. 215, 32 P.3d 735, to the compounding instructional and verdict form errors at issue here. Upon doing so, those compounding trial errors may be overlooked as harmless only if there is no reasonable probability that they impaired the jury's ability to unanimously and unambiguously determine and declare that Wood was guilty of personally causing LaFriniere's shooting death, as clearly distinct from an alternative determination that she was legally accountable for the deliberate homicide by actively aiding or abetting its commission, in common purpose with another who affirmatively acted in concert and common purpose with Wood to cause that same result. Under the particular circumstances at issue here, we cannot confidently make such a finding. We therefore hold that the District Court's combined instructional and verdict form error was reversible error in violation of Wood's fundamental constitutional rights to due process of law.[16]

---

[16] *See* Mont. Const. art. II, §§ 17, 24, and 26, and U.S. Const. amends. VI and XIV.

¶52   In closing, without comment on the ultimate admissibility on retrial, if any, on remand, we caution the State and District Court regarding Wood's contemporaneous objections regarding the foundational M. R. Evid. 702-03 reliability and admissibility of the relational cell phone location methodology, analysis, and conclusions presented by the State, and admitted by the District Court, through the expert testimony of Sy Ray, Mike Fegely, and their proprietary ZetX TRAX software.  In response to Wood's challenge, the State and the District Court concurred that a foundational hearing and determination were necessary, *inter alia*, as prerequisites to admissibility of the contemplated expert testimony. While it held such hearing, the District Court made no determinative findings of fact other than cursory assertion regarding its widespread use by state and federal law enforcement agencies.  Nor did the court make findings as to whether and what extent Ray and Fegely either did or did not have training, experience, or other expertise sufficient to render informed and reliable opinion testimony regarding the subjects of their respective testimonies.  In light of our reversal of the conviction on other grounds, we decline to attempt independent review of this technical subject matter on appeal for foundational M. R. Evid. 702-03 compliance and admissibility in response to Wood's assertion of error. Note, however, that those matters will need to be addressed prior to any retrial should the State again seek to offer this evidence.

## CONCLUSION

¶53   We hold that the District Court erroneously submitted the State's alternatively charged accountability to deliberate homicide by aiding or abetting theory for jury consideration and determination.  We hold further that the above-noted combination of

39

instructional and verdict form error was not harmless error, and is therefore reversible error. Wood's April 2021 deliberate homicide conviction in the Montana Twentieth Judicial District Court, Sanders County, is thus hereby reversed, and remanded for new trial in the State's discretion.

/S/ DIRK M. SANDEFUR

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ JIM RICE

Chief Justice Mike McGrath, concurring.

¶54 I concur in the Court's ultimate holding. I write separately to address the admission of real-time tool (RTT) or time-of-arrival (TOA) distance measurements in this case, which will almost certainly be appealed again to this Court after a new trial. *Accord* § 3-2-204(3), MCA; *Faulconbridge v. State*, 2006 MT 198, ¶ 38, 333 Mont. 186, 142 P.3d 777. Wood makes several distinct arguments about the admissibility of this data.

¶55 Initially, I note that many cases cited by Wood generalize and refer to a broad range of data from cellphones as "cell-site location information" or "CSLI." Unfortunately, this generic term encompasses multiple types of data, each of which vary in accuracy and reliability and, as such, it is necessary to explain what is and is not at issue here.

40

Additionally, accurately identifying the specific data at issue in the cases cited by Wood is necessary to determine the persuasive value of each case.

¶56 The most accurate types of CSLI, which are not at issue here, are GPS and Wi-Fi data. These types of data are generally accurate and not subject to reasonable dispute. *See, e.g.*, *United States v. Jimenez-Chaidez*, 96 F.4th 1257, 1268 n.4 (9th Cir. 2024); *United States v. Reynolds*, 86 F.4th 332, 342–43 (6th Cir. 2023) (*Reynolds II*).

¶57 The least accurate type of CSLI, also not at issue here, are records that cellphone companies keep, called call detail records (CDRs). CDRs include many data points, some of which may be helpful in determining a broad general area where a cellphone was located. Vladan M. Jovanovic & Brian T. Cummings, *Analysis of Mobile Phone Geolocation Methods Used in US Courts*, 10 IEEE Access 28037, 28038 (2022). For our purposes, it is enough to say that these records contain the antenna that the phone connected to and its azimuth, which gives no indication of the phone's location except for a sometimes very large area where the phone could be to have been able to connect to that antenna (although additional data points sometimes included in CDRs may help an expert narrow down a possible location within the larger area). Jovanovic & Cummings, 10 IEEE Access at 28048. Without more information from cellphone companies, some programs such as Trax (the program used here to map the RTT data) estimate an antenna's coverage area using a uniform shape that may be "inherently unreliable" for many purposes. Jovanovic & Cummings, 10 IEEE Access at 28050.

¶58 Nevertheless, there are some uses of this data which are relevant and admissible. *See, e.g.*, *United States v. Reynolds*, 626 Fed. App'x 610, 617–18 (6th Cir. 2015)

41

(*Reynolds I*) (admitting CDRs to rule people *out* of a particular location based on the location of the antenna their phone was connected to at relevant times and finding it important that the expert declined to draw a conclusion about the defendant's particular location based on this data alone); Jovanovic & Cummings, 10 IEEE Access at 28051 n.27 (suggesting this data could be useful when it shows a progression of connections over time that "may indicate the phone movements and provide an idea about possible phone whereabouts at certain times, even without being able to pinpoint particular locations"); *Reynolds II*, 86 F.4th at 347 (allowing Trax's mapping technique to show the *general* location of a phone when neither the map nor the expert overpromised on the technique's precision and testimony showed that the phone could be anywhere within the highlighted map area). This data has been admitted but limited in other cases. *See, e.g.*, *United States v. Jones*, No. 3:21-cr-89, 2022 U.S. Dist. LEXIS 231084, *19–*27 (W.D. Ky. Dec. 23, 2022) (allowing testimony on the general location of defendant based on CDR data but excluding maps generated from the same data that "precisely marked [an] area that ruled in or out specific blocks and streets" without expert testimony on how the Trax mapping software could come to those specific conclusions). Clearly, this data requires clear boundaries on its use and must be carefully examined by a court to limit its intended use to that which the data can support. Notably, Wood does not challenge the use of this data here, which was only used to support certain facts, such as that she traveled down to Missoula and then back up to Thompson Falls contemporaneously with the TracFone being activated in Missoula—exactly the type of inference that Jovanovic and Cummings assert is proper with this type of data, and which was also corroborated by uncontested Wi-Fi

data. 10 IEEE Access at 28051 n.27. By itself, this data would be especially unhelpful to locate a phone within Thompson Falls, which only has one cell tower.

¶59 Finally, there is also RTT data, which is the type of data that Wood puts at issue here. RTT data is data that cellphone companies keep and use in the ordinary course of business to create a reliable network for users. *Reynolds II*, 86 F.4th at 343. This data shows the approximate distance between a cellphone and an antenna, calculated by the time it takes for a "ping" from a cellphone to reach the antenna and return to the cellphone "based on the propagation speed of [radiofrequency] waves (speed of light)." *Reynolds II*, 86 F.4th at 343; Jovanovic & Cummings, 10 IEEE Access at 28038. Because cellphone towers generally have three antennas covering 120 degrees each, this calculated distance can be plotted as a 120-degree arc emanating from the tower, and one would expect that the device is along that arc somewhere. Jovanovic & Cummings, 10 IEEE Access at 28038; *Reynolds II*, 86 F.4th at 343. These distance measurements are "never perfect." Jovanovic & Cummings, 10 IEEE Access at 28038. There are both rounding errors and errors from environmental factors that cause the calculated distance, on average, to be greater than 89 meters off the plotted arc in 33% of cases, and greater than 150 meters in 5% of cases. Jovanovic & Cummings, 10 IEEE Access at 28038. Notwithstanding the underlying error rate, "the location estimates [plotted on arcs] are straightforward to calculate numerically" and are "generally accepted in the relevant scientific/technical

community." Jovanovic & Cummings, 10 IEEE Access at 28038–39; *Reynolds II*, 86 F.4th at 345.[1]

¶60    The first issue Wood argues is whether the District Court should have conducted a *Daubert*[2] hearing on the RTT data itself or the use of the data to plot an arc on a map to visualize it. Montana Rule of Evidence 702 generally governs the admission of expert testimony. *Hulse*, ¶ 55. Rule 702 looks at three main questions: (1) whether the expert field is reliable, (2) whether the expert is qualified, and (3) whether the qualified expert reliably applied the reliable field to the facts. *State v. Clifford*, 2005 MT 219, ¶ 28, 328 Mont. 300, 121 P.3d 489. Under the first factor, the court determines whether the expert field is reliable, which the *Daubert* test can help determine. *Clifford*, ¶¶ 28–29; *McClue*, ¶ 22. Not all scientific expert testimony is subject to *Daubert*; instead, "the *Daubert* test should only be used to determine the admissibility of novel scientific evidence." *Hulse*, ¶ 56 (internal quotation omitted); *see also Hulse*, ¶ 49 (assessing novelty is not based on whether a court has evaluated it as "[e]very useful new development must

---

[1] Importantly, Wood concedes in briefing that "triangulation" is an established method of estimating a person's location from cellular data because it has been tested and validated by the scientific community. Triangulation makes use of the same RTT information used here, but from multiple cell towers, to give a more accurate picture of where the user was by plotting multiple arcs that intersect to "pinpoint a phone's location within 50 meters." *Carpenter v. United States*, 585 U.S. 296, 313, 138 S. Ct. 2206, 2219 (2018); *see also* Jovanovic & Cummings, 10 IEEE Access at 28039 fig.1 (visualizing triangulation through RTT arcs).

[2] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993). *Daubert* assists the trial court in screening the scientific or technical field for reliability. *Hulse v. DOJ, Motor Vehicle Div.*, 1998 MT 108, ¶ 52, 289 Mont. 1, 961 P.2d 75; *McClue v. Safeco Ins. Co.*, 2015 MT 222, ¶ 22, 380 Mont. 204, 354 P.3d 604. It looks at (1) whether the technique can and has been tested, (2) whether the technique has been subject to peer review or publication, (3) a known or potential rate of error, and (4) whether the technique is generally accepted or rejected in the scientific field. *Hulse*, ¶ 52.

have its first day in court"). The court then determines under the second factor whether the witness is qualified as an expert in that field through knowledge, skill, experience, training, or education—if so, the court should admit the evidence, shaky as it may be. *Clifford*, ¶ 28; M. R. Evid. 702. Under the third factor, the fact finder—not the court—determines whether the expert reliably applied the principles of that reliable field to the facts of the case, which is examined by vigorous cross examination, presentation of contrary evidence, and instruction on the burden of proof. *Clifford*, ¶ 28; *Hulse*, ¶ 62. The reliability of an expert's application of the field to the facts is immaterial in determining the reliability of the expert field itself. *Clifford*, ¶ 30.

¶61 Here, I would conclude that the underlying RTT data and the method of mapping that data is reliable and is not novel. *Accord* Jovanovic & Cummings, 10 IEEE Access at 28050–51 (asserting that geolocation based on RTT measurements can provide useful and reliable location estimates and recommending that governments compel network operators to include RTT data in all CDRs to increase their accuracy for evidence); *Reynolds II*, 86 F.4th at 345 (concluding no *Daubert* analysis was required for RTT data when defendant's expert, Jovanovic (the same as cited in the above article relied upon by Wood), agreed that Trax's use of arcs to map RTT data is "generally accepted in the relevant scientific/technical community"); *Carpenter*, 585 U.S. at 313, 138 S. Ct. at 2219. RTT data is collected by cellphone companies for billing and coverage purposes and to keep track of a phone so that an incoming call or text can be quickly routed to it. These companies rely on the data and have a vested interest in maintaining accurate records to ensure they remain competitive in the industry. Nor is it novel for someone with a given

45

distance estimate to plot an arc on a map emanating from a given location. *Accord State v. Ramirez*, 5 Wn. App. 2d 118, 425 P.3d 534, ¶ 46 (Wash. Ct. App. 2018) ("[C]omputer programs routinely generate maps that correspond to real-world data.").[3] Wood had her own expert—or really anyone with google maps or a ruler and a drawing compass—who could have plotted, replicated, and tested the arcs shown on the State's maps and challenged them on cross-examination if they were inaccurate. As the State's expert testified at the motion in limine hearing: "I'm not interpreting [the RTT data]. All I'm doing is giving it a graphic representation on the map." *Accord United States v. Evans*, 892 F. Supp. 2d 949, 953 (N.D. Ill. 2021) (agreeing that plotting locations on maps does not require specialized knowledge and admitting the maps under Rule 701). In addition, RTT data has known error rates. Jovanovic & Cummings, 10 IEEE Access at 28038. Finally, Wood concedes that triangulation is a reliable and not novel field that has been tested and used by the scientific community. *See also Reynolds II*, 86 F.4th at 345. Mapping RTT data and triangulation uses the same technique, just with fewer data points. Although a single RTT measurement is much less accurate than triangulation, the underlying science—and thus the reliability of the scientific *field* under the first prong of Rule 702—is the same. The accuracy goes to how much weight the jury should give the

---

[3] Importantly, plotting cellphone companies' data onto arcs is distinct from the maps Trax generates with CDR data. There, Trax is not just plotting a known arc onto a map but instead estimates the range of a tower based on its own proprietary algorithm. This method for estimating the range of a cellphone tower might need deeper probing by a district court to ensure that the field is reliable depending on the purpose that it is offered for. *See generally Reynolds II*. Trax maps numerous types of data obtained by cellphone companies—RTT, CDR, GPS, etc.—onto maps to better visualize the data. Thus, it is not helpful to generalize Trax's mapping techniques as reliable or unreliable as a whole. Rather, each case should analyze what data the government is trying to introduce and for what purpose before deciding whether it is novel or reliable.

evidence under the third prong, not its admissibility under the first or second prong. *Hulse*, ¶¶ 62–63; *Clifford*, ¶ 28. Vigorous cross-examination, presentation of conflicting evidence, and instruction on the burden of proof—rather than exclusion of the evidence— are the proper tools for Wood to attack this evidence.

¶62 Thus, *Daubert* does not apply to RTT data or its plotting onto a map, and the court need only evaluate expert testimony under the remaining prong of Rule 702 and other relevant rules of evidence. Under the second prong, the court decides whether the expert is qualified. *Clifford*, ¶ 28. Wood first argues that the State's experts cannot be qualified because neither of them are radio frequency engineers. But, for the testimony that the State's experts gave, neither of them needed to be radio frequency engineers to qualify as experts under Rule 702, which allows for "a witness qualified as an expert by knowledge, skill, experience, training, *or* education." (Emphasis added.) A trial court has broad discretion in determining the admissibility of evidence. *Hulse*, ¶ 48. The court heard foundational testimony of the State's experts' decades of experience in using and analyzing cellphone data to locate or track phones both in real time and historically. These experts clearly had experience, training, skill, and knowledge in the areas they testified about. Rule 702 does not require an expert to be qualified by every factor, as shown by the word "or" in that rule. *State v. Stout*, 2010 MT 137, ¶ 59 n.1, 356 Mont. 468, 237 P.3d 37. An education in radiofrequency engineering, while it may be relevant to certain testimony, was not necessary for the testimony that the State's experts offered when they showed by their

training, experience, knowledge, and skill that they were qualified to offer the opinions offered.[4]

¶63 Given that the third factor in Rule 702 is for the jury, I would hold that the District Court did not abuse its discretion in admitting the State's experts under Rule 702. Many of Wood's arguments go to this third factor. For these arguments, Wood should vigorously cross-examine the State's witnesses and offer her own evidence to cast doubt on the State's conclusions. "'[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Hulse*, ¶ 62 (quoting *Daubert*, 509 U.S. at 596, 113 S. Ct. at 2798); *see also Clifford*, ¶ 28; *McClue*, ¶ 23.

¶64 In the alternative, Wood argues that the District Court should have excluded the evidence under Rule 403. Notwithstanding admissibility under Rule 702 or other rules, relevant evidence "may be excluded if its probative value is *substantially* outweighed by the danger of *unfair* prejudice" or misleading the jury. M. R. Evid. 403 (emphasis added). The rule favors admission, and thus evidence should not be excluded under Rule 403 unless the prejudice is both unfair and substantial because "[p]robative evidence is generally prejudicial to one side or the other." *State v. Madplume*, 2017 MT 40, ¶ 33, 386 Mont. 368, 390 P.3d 142. Evidence is *unfairly* prejudicial "only if it arouses the jury's hostility

---

[4] The one opinion given by the State's experts that might not have been supported by their qualifications is that it was "mathematically impossible" for the devices to not be in close proximity to each other. While their qualifications may allow for similar opinions and conclusions based on the data, there was no foundational testimony about their qualifications to give conclusions based on mathematical absolutes. Nevertheless, Wood did not object to this conclusion at trial, and I would hold that it was not plain error given the testimony as a whole.

48

or sympathy for one side without regard to its probative value, if it confuses or misleads the trier of fact, or if it unduly distracts from the main issues." *Madplume*, ¶ 33 (internal quotation omitted); *see also State v. Pelletier*, 2020 MT 249, ¶ 21, 401 Mont. 454, 473 P.3d 991.

¶65    Wood points to two main pieces of evidence that should have been excluded under Rule 403.  First, Wood argues that the State's witness repeatedly overpromised on the accuracy of the data by testifying that the data showed that the TracFone was "right on top of," or "perfectly paired" with, Wood's phone.  RTT data only provides a distance range from a cell tower and does not provide a precise direction from the tower, leading to an arc that a phone could fall anywhere on.  As such, where two phones provide a same or similar distance estimate from a tower, it is certainly possible that the two phones are miles apart from each other, but still the same distance from the tower—i.e., at opposite ends of the arc.  Given this data, if the State's experts concluded that the two phones were "right on top of" each other, it certainly would call into question whether the jury was being unfairly misled by the State's experts.  However, a review of the trial transcripts shows that Wood misstates the expert testimony.  Instead of telling the jury that the two *phones* were right on top of each other, the State's experts emphasized that the two *arcs* were repeatedly on top of each other or perfectly paired:

- "[T]he RTT, they're almost perfectly paired.  And when I say perfectly paired, earlier I was saying a tenth [of a] mile."

- "And the RTT you'll see -- in fact sometimes you really have to zoom in because . . . [s]ometimes one line [(arc)] might be right on top of the other and you can't see the one that's being covered up."

- "Is it possible on the snapshot here where I'm looking at one connection for each device and I'm only looking at that one connection and both of those devices are 4.6 miles from the cell site, and they're not together? Absolutely. Because one could be on one side of the arc, the other one could be on the other side of the arc. And that's where we have to look at this record set in totality. We have to look at the entire record set together. And when we do that, they're [(the arcs)] always together, they're always right on top of each other. We start to hit a point where it's mathematically impossible for that to be a coincidence."

- At other times, the State's expert discussed much more accurate Google location data from Wood's phone that fell "right on top of" the arcs from the TracFone.

- The State's expert testified that one possible explanation of the arcs being right on top of each other is that the phones were being carried by one person.

- "They had some [RTT] reports that weren't right on top of each other, but what we saw was when the movement started towards the highway they were both consistent with moving that same direction."

- Summarizing his expert opinion for the jury, Fegely concluded that whenever the TracFone was active and had location information, the TracFone and Wood's phone were "essentially in the same *area*."[5] (Emphasis added.)

Indeed, it was only Wood's counsel that (outside of the jury's presence) said that the arcs showed the phones "right on top of each other."

¶66    The State's argument to the jury was that each (and every) time RTT data was available from the TracFone, it showed almost the same distance from the tower as Wood's phone. Each time this happened, it became less and less likely that the two phones were on opposite ends of the arcs and more likely that they were together or in close proximity. The State's experts also repeatedly emphasized that RTT data is far from pinpoint accurate,

---

[5] *Compare* Opinion, ¶ 19 (summarizing Fegely's conclusion as being "'essentially' at the same *location*" (emphasis added)).

that a "rule of thumb" is that the arcs could be off by one-tenth of a mile or (rarely) more, that the arcs can "wobble" from interference from the surrounding environment even when stationary and easily be thrown 50 yards off, and that the data is not meant to be an "X" that marks the spot. Given the multiple data points, on multiple days, in multiple cities, and showing movement consistent with each other, it was proper for the State's experts to conclude that the two phones were consistently together or in close proximity to each other whenever there was activity from the TracFone. This was a proper inference to make from the data. This data and the conclusions drawn from it was absolutely prejudicial towards Wood—but it was not *unfairly* prejudicial.

¶67    Wood also argues that the State's demonstrative video of the data over time was unfairly prejudicial or unfairly misleading. Similar to her other argument, Wood takes specific screenshots of the video out of context and asks us to hold that they are unfairly prejudicial. At the points in the video that Wood challenges, the map has zoomed in on certain locations—such as her house—that the arcs overlap. She argues that this misleads the jury by suggesting that this is the only location that the phones could have been instead of anywhere along the arc. But this demonstrative video taken in context and played alongside the expert testimony also did not overpromise on the data such that it would mislead the jury.

¶68    First, before the video was shown to the jury, the State's expert testified that:

> [W]e have some really good datasets that are reviewed in this particular case where you're going to see things and you're going to think, "that device is in that building or that device is in that house." And I'll be the first one to say we cannot say that that device is in the building; we cannot say that that device is within the house, because it's within that accuracy error there [(one-

51

tenth or -twentieth of a mile)].  We can say it's very close to the house.  We can say it's consistent with what I'd expect if the phone was in the house.  But, yeah; my testimony is never going to be so precise that I'm ever . . . saying that device is absolutely inside the house.

(Quotation marks added for clarity.)  Once the video was playing, the first couple of times it zoomed in on Wood's house was to show Wi-Fi location data from Google from Wood's phone at or near her house.  Wood does not challenge this data or the zoom in on the house when showing this data.  The demonstrative video then placed a marker on the house so that the jury could always see where it was when the video zoomed back out.

¶69    Wood argues that when the data is from an RTT arc, zooming in on the house to exclude the rest of the arc misleads the jury.  The first time the video does this, it first shows the entire arc from RTT data associated with Wood's phone.  The map then zooms in to show that the arc is nearby, but does not cross immediately over top of, Wood's house.  At that time, there is also Google Wi-Fi data from Wood's phone that shows a radius over Wood's house and not directly on, but nearby, a point on the RTT arc.  The State's expert used this to illustrate the "wobble" that RTT data has, that it is "not meant to put you on an X marks the spot," that it takes very little to throw the RTT arc off by 50 yards or more, to show that it is not as accurate as Wi-Fi data, and to emphasize that any single data point is less important than the story that all the data together can tell.  The demonstrative video in context of the expert's testimony clearly was not designed to mislead the jury, but in fact to explain the limits of this data.

¶70    At another point, RTT data showed the TracFone at some point along an arc 4.42 miles from the cell tower.  RTT data from Wood's phone within 15 seconds of the

TracFone data showed it was at some point on an arc 4.44 miles from the cell tower. Wood's phone also provided Google Wi-Fi data from this time period. The demonstrative video zoomed in on the Wi-Fi location data to show that the more precise radius of Wi-Fi data intersected with both RTT arcs. The State's expert concluded that the data is consistent with both phones being in the same location, again noting that there is an error rate and "wobble" associated with RTT data. Other instances and testimony that showed the TracFone's approximate location were similarly discussed.

¶71 Wood did not object at trial to any of this testimony or to the demonstrative exhibit in the way she now argues is reversible error. But even with a proper objection, I would not hold—taking the video and the testimony together and in context as a whole—that the District Court abused its discretion in refusing to exclude it under Rule 403. Although this evidence was highly prejudicial—as Wood notes it is "the only evidence connecting [Wood] to the TracFone"—it was not *unfairly* prejudicial, which is what is required to exclude it under Rule 403.

/S/ MIKE McGRATH

Justices Jim Rice and James Jeremiah Shea join the Concurring Opinion of Chief Justice Mike McGrath.

/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE

53